**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC and | § | |
| INTELLECTUAL VENTURES II LLC, | § | |
| | § | |
| *Plaintiffs*, | § | C.A. No. 6:21-cv-01088-ADA |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| GENERAL MOTORS COMPANY and | § | |
| GENERAL MOTORS LLC, | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

**PLAINTIFFS INTELLECTUAL VENTURES I LLC AND INTELLECTUAL
VENTURES II LLC'S SUR-REPLY CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................. 1

II.   THE DISPUTED CLAIM TERMS ........................................ 1

A.    '283 Patent – "component" .......................................... 1

B.    '283 Patent – "first address" ....................................... 2

C.    '283 Patent – Claim 1 ................................................. 3

D.    '283 Patent – "wherein, within the first network, addressing takes place on the basis of a function specific address component" and "wherein addressing within the first network takes place on the basis of the function-specific address components" (Claim 1 and 21) ................... 4

E.    '283 Patent - "Method according to claim 1, wherein a component of the first network registers a communication with the second network with the at least one particular component which communicates with the second network . . . " (Claim 2)" ...................................... 5

F.    '771 Patent - "a Local Area Network (LAN) routing system" (Claims 1 & 9) ................................................................ 6

G.    '771 Patent - "without the need to access an external service controller server" and "stand alone system" ............................. 7

H.    '318 Patent – "transmit opportunity" and "wherein the transmit opportunity is commenced with a control frame" .................. 8

I.    '004 Patent - "automatically forming a network of the plurality of network elements" (Claim 68) ................................ 10

J.    '004 Patent - "the assembled plurality of network elements" (Claim 68) ........... 11

K.    '356 Patent - "assigned time intervals" and "in a time interval" ................. 12

L.    '356 Patent - "the processor is further configured to receive feedback information from a downlink control channel" and "receiving, by the UE, feedback information from a downlink control channel" (Claims 1 & 22) ......... 12

M.    '158 Patent - "integration time" (Claims 1-3, 7-9, 11-16) ................... 13

N.    '158 Patent – "an image capture device" (Claim 1) ............................ 15

O.    '158 Patent – "an interface … configured to receive the integration time of each sensor as an input to an image capture device" .......................... 16

P.    '475 Patent - "violation" .............................................. 17

Q.    '608 Patent - "first user preference" (Claims 1-8, 10-14) ................... 18

R.    '608 Patent – "a geographic area limitation" (Claims 1, 2, 5, 8, 9, 12) ............ 18

S.    '608 Patent – "substantially real-time updates" (Claims 3 & 10) ............ 19

T.    '466 Patent ................................................................ 20

       1.     "first parameter," "second parameter," "third parameter," and "fourth parameter" (Claims 1, 3, 6, 8) .................................................... 20

       2.     "wherein resources are allocated for data of each channel having a second parameter above zero prior to another channel's data for transmission having a third parameter less than or equal to zero" (Claims 1 and 6) ........................................................................ 21

  U.     '628 Patent - "Store video data in the buffer" ................................................... 22

  V.     '138 Patent - "wherein the selection of the data occurs using a first iteration and a second iteration" (Claims 1 and 8) ........................................ 23

  W.    Alleged Section 112, ¶6 Functional Claiming ..................................................... 24

       1.     '771 Patent: "local content module …" (claim 4) ....................................... 24

       2.     '318 Patent: "processor configured to …" (claim 8) .............................. 25

       3.     '356 Patent: "processor … configured … to …" (claim 1) .................... 25

       4.     '641 Patent: "circuitry configured to …" (claim 11) / "mobile station is configured to …" (claims 11 and 25) ........................................ 26

       5.     '158 Patent: "processing component … configured to" (claims 1, 5, and 9) ............................................................................................ 27

       6.     '475 Patent: "processing module configured to …" (claim 15) .............. 28

       7.     '628 Patent ("processor configured to …") Claim 1 ............................... 28

       8.     '138 Patent ("processor is configured to") (Claim 1) ............................. 29

III.    CONCLUSION ............................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*BASF Corp. v. Johnson Matthey Inc.*,
    875 F.3d 1360 (Fed. Cir. 2017)....................................................................................9

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*,
    435 F.3d 1366 (Fed. Cir. 2006)..................................................................................11

*Ex Parte Erlich*,
    3 U.S.P.Q.2d 1011 (B.P.A.I. 1986)..............................................................................4

*Grantley Pat. Holdings, Ltd. v. Clear Channel Commc'ns, Inc.*,
    No. CIV.A. 9:06CV259, 2008 WL 5428186 (E.D. Tex. Apr. 21, 2008)...................9

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
    452 F.3d 1312 (Fed. Cir. 2006)..................................................................................22

*Intell. Ventures II LLC v. Sprint Spectrum L.P.*,
    No. 2:17-CV-662-JRG-RSP, 2018 WL 6018625 (E.D. Tex. Nov. 16, 2018) .........21

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)........................................10

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)............................................................................23, 29

*Phoenix Licensing, L.L.C. v. AAA Life Ins. Co.*,
    No. 2:13-CV-1081, 2015 WL 1813456 (E.D. Tex. Apr. 20, 2015)..........................12

*Pulse Elecs., Inc. v. U.D. Elec. Corp.*,
    860 F. App'x 735 (Fed. Cir. 2021) ...........................................................................22

*Realtime Data, LLC v. Rackspace US, Inc.*,
    No. 6:16-cv-961, 2017 WL 2590195 (E.D. Tex. June 14, 2017) ............................26

*RideApp Inc. v. Lyft, Inc.*,
    845 F. App'x 959 (Fed. Cir. 2021) ...........................................................................20

*Sling TV, L.L.C. v. Uniloc*
    2017 LLC, No. 2021-1651, 2022 WL 306468 (Fed. Cir. Feb. 2, 2022)....................7

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
    844 F.3d 1370 (Fed. Cir. 2017).................................................................................8

*Supernus Pharmaceuticals, Inc. v. TWi Pharmaceuticals, Inc.*,
747 F. App'x 852 (Fed. Cir. 2018) .............................................................................3

*Swissdigital USA Co. v. Wenger S.A.*,
No. 6:21-cv-00453-ADA-DTG, 2022 WL 3567348 (W.D. Tex. Aug. 18,
2022) .........................................................................................................................13

*United States Auto. Ass'n v. Wells Fargo Bank, N.A.*,
No. 2:18-cv-00245-JRG, 2019 U.S. Dist. LEXIS 99285 (E.D. Tex. June 13,
2019) ...................................................................................................................12, 13

## I.    INTRODUCTION

Plaintiff Intellectual Ventures I LLC and Intellectual Ventures II LLC ("Intellectual Ventures" or "IV") submits this Sur-Reply Claim Construction Brief in support of IV's proposed claim construction of the terms and phrases identified for construction from the claims of U.S. Patent Nos. 6,832,283 (the "'283 patent"), 7,891,004 (the "'004 patent"), 9,934,628 (the "'628 patent"), 9,291,475 (the "'475 patent"), 7,382,771 (the "'771 patent"), 9,232,158 (the "'158 patent"), 9,681,466 (the "'466 patent"), 10,292,138 (the "'138 patent"), 8,953,641 (the "'641 patent"), 8,811,356 (the "'356 patent"), 7,684,318 (the "'318 patent"), and 9,602,608 (the "'608 patent") (collectively, the "Asserted Patents" or "Patents-in-Suit") and in response to Defendants General Motors Company and General Motors LLC's ("General Motors" or "GM") Reply Claim Construction Brief ("GM Reply Brief" or "GM Reply Br.") (Dkt. 56).

## II.    THE DISPUTED CLAIM TERMS

### A.    '283 Patent – "component"

| IV's Construction | GM's Construction |
|---|---|
| "A functional block subdivided from a control device." | Plain and ordinary meaning. |

IV's proposed construction is based on the '283 patent intrinsic record that addresses the goals of the invention. IV explained in its responsive brief ("IV Brief" or "IV Resp. Br.") (Dkt. 55) that the '283 patent specification identifies function-specific addressing. (IV Resp. Br. at 2 (citing *e.g.* '283 patent at 2:23-31).) The '283 patent explains that when components were exchanged in a vehicle in the prior art the destination addresses can change.[1] *See* '283 patent at 2:39-45. The '283 patent explains, consistent with IV's proposed construction, that functional addressing is possible because control devices have components "that are ***subdivided into function***

---

[1] However, the advantage for function-specific addressing is that the component can be addressed via its main function block and when components are exchanged, the device address changes, but not the function allowing the new component to be addressed. *Id.* at 2:41-45.

***blocks*** (*id.* at 6:52-54 (showing Figure 1 control device 3 with two function blocks 8 and 9)) so that each function block can be addressed via the function-specific address component independent of the logical address of the component to which the function block is allocated.[2]  *Id.* at 4:26-33. Thus, Figure 1 shows control device 3 that has two function blocks 8, 9 which have a function-specific address component *e.g.* 0X51 and 0x06.  *Id.* at 6:54-58.  *See* IV CC Resp. Br. at 2 (citing '283 patent at 6:52-53 and 9:28-31).)  GM claims that IV's construction is divorced from the specification (GM Reply Br. at 1), but as shown above, this is false.  Indeed, GM's first argument is not a reference to the '283 patent specification, but a reference to an extrinsic definition.  (GM Reply Br. at 1 (citing Ex. K at 4).)

### B.     '283 Patent – "first address"

| IV's Construction | GM's Construction |
|---|---|
| "A logical address that specifies the physical location of a control device, and a function-specific address associated with a subdivided component of the device." | Plain and ordinary meaning. |

The main dispute for this term is whether the limitation "first address" should require both logical and a function-specific address.  GM argues that the term "first address" does not require both.  However, the '283 patent specification explains that "according to the invention" the component for the communication with the other network has two addresses.  *See* '283 patent at 2:66-3:2 ("According to the invention, the component for the communication with the other network has two addresses") and 6:39-43 ("Each control device 2 to 6 and every other component connected to the data bus 1 is assigned a first address which on the one hand, can specify the physical location of the component and, on the other hand, also its functional association.").  As explained in IV Brief, the examiner interview summary "explained the invention and how the

---

[2] Figure 1 shows control device 3 that has two function blocks 8, 9 which have a function-specific address component *e.g.* 0X51 and 0x06.  *Id.* at 6:54-58.  *See* IV Resp. Br. at 2 (citing '283 patent at 6:52-53 and 9:28-31).)

components can have logical as well as functional addresses." (IV Resp. Br. at 3 (citing Ex. 2,

June 30, 2004 Examiner Interview Summary).) Indeed, Figure 2 shows a table representing an

allocation of addresses to different components as can be stored in the central register "according

to the invention," which includes a logical and function addresses. *See* '283 patent at Fig. 2 and

5:58-60.

| LogicalAddr | FunctionAddr | InstAddr | IP Addr |
|---|---|---|---|
| 0x100 | 0x22 | 0 | 10.0.22.1 |
| | 0x06 | 1 | |
| | 0x08 | 1 | |
| | 0x40 | 1 | |
| 0x101 | 0x51 | 0 | 10.0.51.1 |
| | 0x06 | 2 | |
| 0x102 | 0x33 | 1 | 10.0.33.2 |
| 0x103 | 0x33 | 2 | 10.0.33.3 |
| 0x104 | 0x60 | 0 | 10.0.60.1 |
| | 0x40 | 2 | |
| | 0x06 | 3 | |
| | 0x08 | 2 | |

GM argues that claim differentiation in claim 10 and 21 prevents the term first address

from requiring both logical and function addresses due to the language "and/or." GM is mistaken

in view of the specification and the file history. The term and/or means solely "and" in this

particular case. *See Supernus Pharmaceuticals, Inc. v. TWi Pharmaceuticals, Inc*., 747 F. App'x

852, 856 (Fed. Cir. 2018) (finding and/or meant "and only"). Indeed, it is difficult to understand

how claim 1, which includes the limitation "function-specific address components" doesn't require

a function specific address as GM argues. Thus, claim differentiation cannot apply when it

contradicts the claims themselves, the specification, and the file history.

C.    '283 Patent – Claim 1

| IV's Construction | GM's Construction |
|---|---|
| Plain and ordinary meaning, no construction necessary, the claim is not indefinite. | Indefinite. |

Claim 1 of the '283 patent is not indefinite. In order to fall under the *In re Hartman* line

of cases that GM cites for its indefiniteness argument, GM must show by clear and convincing

evidence that claim 1 does not recite specific steps because it merely claims the benefits that flow from its use. The holding in *In re Hartman* is a perfect example of why claim 1 is not indefinite. In *In re Hartman,* the patent owner sought to claim "a novel business method" thus leaving the claims without any meaningful limitations. *See* 513 F. App'x 955, 957 (Fed. Cir. 2013), *see also* IV Resp. Br. at 4-5 (analyzing cases cited by GM). GM also cites to *Ex Parte Elrich*, but this case claimed "using monoclonal antibodies of claim 4 to isolate and purify human fibroblast interferon" again providing only a stated benefit. *Ex Parte Erlich*, 3 U.S.P.Q.2d 1011, at *8 (B.P.A.I. 1986). Nothing close to that is present here and GM has not shown otherwise. As explained in IV Brief, claim 1 claims "addressing components…. *in which* each component is assigned a first address … and the first addresses are stored in a central register." This is not merely an intended use and does not come close to the *In re Hartman* and the other cases GM cites. GM argues that IV agrees that the preamble is not limiting (GM Reply Br. at 2), but cites to no support. In any case, whether or not the preamble is limiting, IV has identified method steps that are more than a mere recitation of a benefit. GM cannot show invalidity based on indefiniteness.

    **D.**    **'283 Patent – "wherein, within the first network, addressing takes place on the basis of a function specific address component" and "wherein addressing within the first network takes place on the basis of the function-specific address components" (Claim 1 and 21)**

| IV's Construction | GM's Construction |
|---|---|
| Plain and ordinary meaning. | "Wherein, within the first network, addressing takes place on the basis of function-specific address components which excludes standard communication protocols such D2B or MOST." |

GM's asks the Court to find a clear and unmistakable disclaimer to support the importation of the language "excludes standard communication protocols such D2B or MOST." GM argues that IV takes inconsistent positions since IV argued that "function-specific addressing" was a stated goal for the '238 patent in arguing the term "component," but GM contends that "IV argues that this addressing could just be the prior art standard communication protocols." (GM Reply Br.

at 3-4.)  GM, again, mischaracterizes IV's position.  First, IV's positions are not inconsistent.  As explained above, the term "component" clearly covers function-specific addressing since the claim itself includes the limitation "function-specific address components."  *See* '283 patent at claim 1. Second, GM does not argue that claim 1 covers the prior art.

Indeed, there cannot be a clear and unmistakable disclaimer in the specification cite that GM identifies (2:46-56 GM Reply Br. at 4) because one of the '283 patent embodiments uses an optical D2B and MOST data bus 1.  *See e.g.* '283 patent at 6:12-15 ("In the illustrative embodiment, the data bus 1 is an optical D2B or MOST data bus with basically time-synchronous data transmission.").  The '283 patent goes one step further and explains that "the invention can also be performed in ***any other*** databus 1 …"  *Id.* at 6:15-19 (emphasis added).  Thus, the '283 patent specification does not make a clear and unmistakable disclaimer as GM argues, it does the opposite and allows D2B, MOST, or any other databus.  GM's position is a veiled invalidity argument that asks the Court to purportedly confirm that preexisting D2B or MOST protocols that predate the '283 patent are not covered by the '283 patent claims.  However, claim construction is not the right place for GM's apparent invalidity argument.

E.    **'283 Patent - "Method according to claim 1, wherein a component of the first network registers a communication with the second network with the at least one particular component which communicates with the second network . . . " (Claim 2)"**

| IV's Construction | GM's Construction |
|---|---|
| Plain and ordinary meaning. | Indefinite. |

GM is wrong that there is no disclosure for the term "register a communication with the second network with the at least one particular component which communicates with the second network."  (GM Reply Br. at 4-5.)  IV has identified specification support that explains - "when messages are received, their access authorization and their syntax can be checked in this matter." (IV Resp. Br. at 7 (citing '283 patent at 9:20-21).)  This expressly or implicitly includes registering

and the IV Brief includes expert support explaining that one skilled in the art would understand this disclosure, along with the other disclosures, provides the necessary support. (*Id.* at 7-8 (citing Hernandez Decl. at ¶¶ 103-110.))  This is fatal to GM's argument and it's burden to show invalidity by clear and convincing evidence.  Moreover, even if the Court were to find that no disclosure is present, GM's focus on disclosure alone conflates enablement with written description.  The Federal Circuit rejected a similar argument in *Augme Techs., Inc. v. Yahoo! Inc.*, where the defendant argued that the patent at issue only disclosed that an ingest server receives digital content and not a unique identifier as required by the claims.[3]  *See* 755 F.3d 1326, 1340 (Fed. Cir. 2014).  The same is true here, even if the Court were to find that there is no specific disclosure of registering, a POSITA would find ample support for the claim.  *See* Hernandez Decl. at ¶¶ 103-110.

### F.     '771 Patent - "a Local Area Network (LAN) routing system" (Claims 1 & 9)

| IV's Construction | GM's Construction |
|---|---|
| **Revised Construction:**  a system that directs data between a local area network and the Internet by managing the data path between a wireless access point and an Internet access interface. | Plain and ordinary meaning. |

IV proposed a construction for "a Local Area network (LAN) routing system" to be consistent with a prior claim construction entered by the PTAB.  *See* IV Resp. Br. at 8-9 (citing Waldrop Decl. Ex. 3, March 13, Final Written Decision on remand, at 11 and Ex. 4, September 9, 2015 Final Written Decision, at 9-10.)  GM argues against the construction because the language "direct data between a local area network and the Internet" is not present in the claim.  The PTAB found that "the routing system directs (i.e. exchanges, routes, or communicates) data between

---

[3] The Federal Circuit found that the defendant mixed up the concept of enablement and written description and found that the standard for indefiniteness was whether those skilled in the art would understand what is claimed when the claim is read in light of the specification and that the limitation was clear on its face and unquestionably met the standard despite the purported lack of disclosure.  *Id.* at 1340.

networks citing to the '771 patent at 3:33-34 ("The LAN Router 16 directs traffic from the access point 12 to the Internet 20 via the fixed WAN interface 18.). (Waldrop Decl. Ex. 4, September 9, 2015 Final Written Decision at 9 (citing 3:33-34).) Thus, the PTAB's construction and analysis and the '771 patent specification support the PTAB's construction. GM's apparent argument that a routing system does not direct, exchange, routes, or communicates data between a local area network and the Internet is plain wrong.

### G.    '771 Patent - "without the need to access an external service controller server" and "stand alone system"

| IV's Construction | GM's Construction |
|---|---|
| Plain and ordinary meaning.<br><br>***Stand-alone system:*** a system capable of operating independently of any other system. | Without the need to connect to an external server before enabling a client device to access the internet |

As explained in IV Brief (IV Resp. Br. at 9), there is no support for GM's position that would limit the term so that the mobile wireless hotspot system does not access an external server before enabling a client device to access the internet. The proposed construction is a blatant non-infringement argument that omits all '771 patent embodiment with no explanation regarding how such a proposed system would even work. *Sling TV, L.L.C. v. Uniloc* 2017 LLC, No. 2021-1651, 2022 WL 306468, at *3 (Fed. Cir. Feb. 2, 2022) (nonprecedential) (finding error in construing claim term in a manner that omitted the preferred embodiment). GM supports its position by twisting the '771 patent file history to invent its non-infringement position. But the PTAB already looked and took into account the same file history discussion when it construed the term "stand-alone" - exactly how IV has proposed. *See* Ex. 35, IPR 2014-00504 Institution Decision at 5-6 ("Petitioner asserts that, during prosecution of the patent application that issued as the '771 patent, the patent applicant distinguished a "stand-alone system" from a system requiring an external controller server, as described in a prior art reference…") Thus, GM's argument that a disclaimer

was made during prosecution is not supported by the PTAB who reviewed the file history and construed the term "stand-alone" only.

As explained in GM's Opening Brief, the portion of the '771 patent file history that GM relies on was amended during prosecution to distinguish the Kokkinen reference and the claims were amended to ensure that the claims included the additional claim language "stand-alone system" to distinguish Kokkinen which the applicant explained was a reference that involved off-loading "much of the functionality" to a service control server.  (IV Resp. Br. at 9 (citing Waldrop Decl. Ex. 5, June 11, 2007 Remarks at 8 and Ex. 7, November 30, 2007 Remarks).)  This portion of the file history does not stand for GM's construction and GM only relies on statements in the file history taken out of context.  Thus, there is no clear and unmistakable disclaimer as GM proposes and the PTAB found none.  GM is also wrong that IV is conflating the terms "stand-alone" system and "external service control server."  As explained in IV Brief, the examiner requested the inclusion of the "stand-alone" language to address Kokkinen and the claims were amended in view of this language.  (IV Resp. Br. at 9 (citing Waldrop Decl. Ex. 7, November 30, 2007 Remarks.)  IV proposes the same construction for stand-alone and GM does not address the term "stand-alone" in its Reply or why this does not address the file history.  (IV Resp. Br. at 9.)

**H.    '318 Patent – "transmit opportunity" and "wherein the transmit opportunity is commenced with a control frame"**

| IV's Construction | GM's Construction |
|---|---|
| Not indefinite. | Indefinite. |

GM argues that the term "transmit opportunity" is a not a "term of art" and therefore renders the claim indefinite.  GM Reply Br. at 7.  But GM is wrong and cannot overcome its overwhelming burden to show indefiniteness.  *Sonix Tech. Co. v. Publ'ns Int'l, Ltd*., 844 F.3d 1370, 1377 (Fed. Cir. 2017).  GM creates an arbitrary standard.  GM incorrectly argues that the term must be considered a "term of art;" for the claim to be sufficiently definite.  GM Reply Br. at

7. Rather, claim need only be reasonably understood by a POSITA. *BASF Corp. v. Johnson Matthey Inc*., 875 F.3d 1360, 1368 (Fed. Cir. 2017) ("scope is understood with reasonable certainty by relevant skilled artisans").

 The remainder of GM's arguments are merely repetitive of its Opening Brief and fail to address any of IV's positions.  For example, GM again regurgitates its mere linguistics argument.  GM Reply Br. at 7.  GM's argument strains credulity.  For example,  GM admits that "transmission opportunity" would be understood by a POSITA, and on the other hand GM argues transmit opportunity, which is slightly modified, is unclear.  *Id*.  GM does not dispute that a POSITA is not a grammarian, but an engineer Dkt. 47-27 (Hansen Decl.) at ¶ 38.  Throughout the specification, patentee referred to an "opportunity to transmit"  and condensed that language to "transmit opportunity."  IV Resp. Br. at 10-11.  GM hinges its argument on the fact that patentee should have used the noun form instead of the verb form but presents no argument that the term would not be understandable to a POSITA.  *Grantley Pat. Holdings, Ltd. v. Clear Channel Commc'ns, Inc*., No. CIV.A. 9:06CV259, 2008 WL 5428186, at *1 (E.D. Tex. Apr. 21, 2008) ("the court construes a claim from the point of view of the artisan of ordinary skill, not from the vantage point of the hyper-technical grammarian").

 GM rehashes its prosecution disclaimer argument, arguing that during prosecution the patentee merely replaced the words transmit with transmission to overcome prior art.  GM is wrong and takes its support out of context.  Patentee was not changing a word to overcome prior art, it was merely rewriting an entire limitation.  IV Resp. Br. at 11-12.  GM, however, disregards the entirety of the amended limitation and argues that patentee merely replaced transmission for its synonym.  That is insufficient to amount to a clear and unmistakable disavowal and ignores the actual amendment the patentee made.  *Id*.  GM continues to incorrectly assert that a transmit

opportunity is a maximum amount of time, even though the file history does not support GM's assertion. For example, GM does not dispute that during prosecution patentee was distinguishing a time interval from allocated bandwidth, and was not defining the term as a maximum. IV Resp. Br. at 12. As IV explained in its Brief, a POSITA would understand that a transmit opportunity relates to a time interval or a window of opportunity. *Id*. at 10, 12. There is no dispute that a time interval can be commenced with a control frame and specification provides examples of such.

I.    **'004 Patent - "automatically forming a network of the plurality of network elements" (Claim 68)**

| IV's Construction | GM's Construction |
|---|---|
| Plain and ordinary meaning, no construction necessary. | automatically assembling and configuring the plurality of network elements to communicate with one another. |

GM's proposal imports limitations "assembling and configuring" and "to communicate with one another" into the claim. GM's proposal further removes claim language "a network" in order to manufacture an antecedent basis issue. Clearly, GM's construction wholly rewrites the claim in an effort to narrow it and find it invalid, and should thus be rejected. *Markman v. Westview Instruments, Inc*., 52 F.3d 967, 983 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ("extrinsic evidence of record cannot be relied on to change the meaning of the claims"). GM manufactures an inconsistency argument combining two terms. GM Reply Br. at 8. Even if GM were right, which it is not, GM does not explain why it seeks to import at least two other limitations into the claim and remove language that provides antecedent basis.

GM does not dispute that claim 1, which is not at issue here, used the language "assembling and configuring" and GM attempts to import that language here into claim 68. GM Reply Br. at 9. It is improper to take a limitation from one claim and import it to another. GM further argues that the patentee referred to forming as assembling. *Id*. Even if that were case, GM does not provide any basis for importing the remainder of its proposed limitations into claim 68. For

example it does not explain why it seeks to import a "configuring" limitation from claim 1. Similarly, GM cites the prosecution history, which it argues treats forming as synonymous with assembling. Again, GM provides no support for the remainder of the limitations it seeks to import into the claim. GM's argument is also inconsistent. GM argues that forming is synonymous with assembling, but seeks to define forming in the claim as assembling ***and configuring***. GM's construction should therefore be rejected. If any argument is inconsistent it is GM's. GM initiated this dispute based on its erroneous interpretation of "automatically." Dkt. 47 at 14. There is no dispute that "automatically" is well understood. GM Reply Br. at 9. The term is even explained in the patent. IV Resp. Br. at 13.

**J.      '004 Patent - "the assembled plurality of network elements" (Claim 68)**

| IV's Construction | GM's Construction |
|---|---|
| Plain and ordinary meaning, no construction necessary not indefinite. | Indefinite. |

GM does not dispute that it did not timely raise this argument and cites no support showing that it preserved its invalidity theory. It should, thus, be deemed waived.

GM manufactured its antecedent basis issue by deleting the phrase "a network" in the prior limitation and provided no support for doing so. GM Reply Br. at 8-9. That is improper. GM apparently argues that the phrase "the assembled plurality of network elements" cannot derive antecedent basis from the term "a network" earlier in the claim because they are not the exact same phrase. GM Reply at 9. But a term need not be identical to its antecedent basis. *See e.g., Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1371 (Fed. Cir. 2006) ("we conclude that 'anode gel' is by implication the antecedent basis for 'said zinc anode'"). Moreover, GM does not address the fact that even if antecedent basis were lacking, the claim may still be sufficiently definite so long as it is reasonably ascertainable to a POSITA. IV Resp. Br. at 15-16. In this case

it would be clear to a POSITA that the term refers back to "a network" appearing earlier in the claim. *Id.*

### K.    '356 Patent - "assigned time intervals" and "in a time interval"

| IV's Construction | GM's Construction |
| --- | --- |
| Agreed Construction | Plain and Ordinary Meaning |

While IV does not agree with the statements made in GM's brief, IV agrees that these terms should be given their plain and ordinary meaning.

### L.    '356 Patent - "the processor is further configured to receive feedback information from a downlink control channel" and "receiving, by the UE, feedback information from a downlink control channel" (Claims 1 & 22)

| IV's Construction | GM's Construction |
| --- | --- |
| Plain and ordinary meaning, no construction necessary. | "the processor is further configured to receive information in response to the signal sent over the uplink physical control channel from a downlink control channel" / "receiving, by the UE, information in response to the signal sent over the uplink physical control channel from a downlink control channel." |

To the extent it is understandable, the crux of GM's argument rests on changing the term "feedback information" into "information in response to the signal sent over the uplink physical control channel." GM's construction confuses the claim term, has no basis in the intrinsic record, and seeks to improperly import limitations into the claim.

GM itself explains that IV "misunderstands GM's argument." GM Reply Br. at 10. Indeed, GM's imported limitation is less understandable than the claim language itself. *See, e.g.*, *Phoenix Licensing, L.L.C. v. AAA Life Ins. Co*., No. 2:13-CV-1081, 2015 WL 1813456, at *28 (E.D. Tex. Apr. 20, 2015) ("Defendants' construction is more confusing than helpful.…Therefore, the term will be given its plain and ordinary meaning"). Moreover, A POSITA would readily understand what is meant by "feedback information" as used in the claim. IV Resp. Br. at 18-19. Other courts have similarly adopted the plain and ordinary meaning of the very same term and rejected attempts to adopt a narrowing definition. *United States Auto. Ass'n v. Wells Fargo Bank, N.A*., No. 2:18-

cv-00245-JRG, 2019 U.S. Dist. LEXIS 99285, at *59 (E.D. Tex. June 13, 2019) ("'feedback' and 'feedback information' each have their plain and ordinary meaning without the need for further construction").

Not only does GM provide no additional support for its construction, but GM imports the term "feedback loop" into the definition when the claim language uses the term "feedback information."  This is a clear attempt to insert confusing non-infringement arguments into the Court's construction.  GM Reply Br. at 10-11.  This is improper.  IV Resp. Br. at 18.

Lastly, GM argues that IV failed to provide an alternative construction.  But for this term, there is no need to redefine the term "feedback information" since the term is clear on its face and, as discussed above, other courts have found the same.  *United States Auto. Ass'n*, 2019 U.S. Dist. LEXIS 99285, at *59.  Moreover, there are only two instances where a Court would deviate from the plain and ordinary meaning; GM does not assert that either applies in this instance.  *Swissdigital USA Co. v. Wenger S.A.*, No. 6:21-cv-00453-ADA-DTG, 2022 WL 3567348, at *3 (W.D. Tex. Aug. 18, 2022).  ("This term does not fit the exceptions of lexicography or disclaimer requiring departure from plain and ordinary meaning").  Therefore, the Court should adopt the plain and ordinary meaning.

### M.    '158 Patent - "integration time" (Claims 1-3, 7-9, 11-16)

| IV's Construction | GM's Construction |
|---|---|
| Plain and ordinary meaning, no construction necessary not indefinite. | The time electrical charge is ***stored or accumulated*** when a sensor is exposed to light.<br>**New construction:**  "The '158 patent is clear that the integration time refers to the time each sensor collects and integrates signal. (Reply at 12.) |

As explained in IV Brief, the term "integration time" was not defined in the '158 patent, and even if it was, GM's original construction did not use the purported "clear" definition.  *See* '158 patent at 4:3-6 ("The amount of integrated photo-charge is directly related to the time the

image sensor collects and integrates signal from the scene.  This is known as integration time").
GM, recognizing that its original proposed construction was supposedly definitional, but did not
use the actual language, GM has now sought to change position to a second definitional
construction - "integration time refers to the time each sensor collects and integrates signal."  (GM
Reply Br. at 12)  GM includes new arguments in its new purportedly definitional construction,
including that "*each sensor* collects and integrates signal" (GM Reply Br. at 12).  Despite this,
GM argues and offers expert testimony that the purported two definitions "are synonymous." (GM
Reply Br. at 11-12 and n. 5 (citing Ex. N at 8-12).)  The Court need only review GM's changing
constructions to find that there was no clear and unmistakable definition.

Instead, the '158 patent specification describes an image processor 270 that combines the
images of two or more camera channels to provide a full-color large dynamic range image.
'158 patent at 9:5-8.  The '158 patent explains that the image processor can send a signal to the
integration time controller 300 for real time or near real time, dynamic range management by
adjustment of each channel integration time control.  *Id.* at 9:11-14.  In other words, integration
time is used as a sampling method to make adjustments that allow the user to create more optional
pictures, including improvements to dynamic range.  (IV Resp. Br. at 20.)  GM's argues that the
integration time cannot be set before the sensor collects and integrates signal (GM Reply Br. at
11) ("IV oddly insists that the term "integration time" includes setting the integration time before
the sensor collects and integrates signal …")), but GM is again mistaken.  As explained in GM's
Opening Brief, integration time can be obtained simultaneously or nearly simultaneously, can be
calculated from processing operations for subsequent frames of data, and can be set automatically
or manually.  (GM Op. Br. at Fig. 7; 3:50-52; 9:11-14.)  Thus, GM's argument that the term
integration time must be obtained simultaneously or near simultaneously only is not supported

because integration time can be set, for example, manually. A POSITA would understand that integration time does not need a construction since a POSITA would understand the meaning by reading the '158 patent specification.

### N.    '158 Patent – "an image capture device" (Claim 1)

| IV's Construction | GM's Construction |
|---|---|
| Plain and ordinary meaning, no construction necessary not indefinite. | A digital device with multiple sensors that each capture a portion of the same image. |

GM incorrectly states that IV "agrees that the claimed device requires multiple sensors." (GM Reply Br. at 12.) IV made no such admission. IV Brief instead explains that other claims include requirements about multiple sensors. (IV Resp. Br. at 21.) Moreover, there is simply no clear and unmistakable disavowal that would require the image capture device to capture "a portion of the same image."

GM again mischaracterizes GM's position stating that the experts agree that the '158 patent achieves a single frame expanded dynamic range with a device that has multiple sensors. The experts do not agree at least for the reasons herein. As explained repeatedly throughout the Sur-Reply, patent claims are not limited to the preferred embodiment unless a clear and unmistakable disavowal or disclaimer is found or unless the patentee serves as a lexicographer. GM argues that "multiple sensors that each capture a portion of the *same scene* is a critical feature," (GM Reply Br. at 13), but its proposed construction uses the language "a portion of the *same image*," which is making GM's construction unclear. GM does not cite a *single* portion of the '158 patent specification to support its proposed construction that requires a portion of the same image (or scene). Indeed, the '158 patent explains that "the sensor may have orthogonal sensor reference axes" which means the sensors do not have to point in the same direction. '158 patent at 19:21-30. Thus, GM's argument that there is no technical way to combine the various images to obtain an optimal exposure of a scene is not supported by the intrinsic record. There is no requirement

that an image capture device must capture a portion of the same image or scene and GM continues to make conflicting arguments without support to import imitations into the claims.

    **O.**    **'158 Patent – "an interface … configured to receive the integration time of each sensor as an input to an image capture device"**

| IV's Construction | GM's Construction |
|---|---|
| Plain and ordinary meaning, no construction necessary. | A user device or connection external to the image capture device. |

GM again tries to raise non-infringement arguments that conflict with the claims and specification in its construction for "an interface…"  There is no portion of the specification that defines the term "interface" as a "user device or connection external to the image capture device" and GM cites no intrinsic record support.  With regards to the claims, GM's position that the interface must be external to the image capture device makes no sense because claim 1 defines the "image capture device comprising" … "a processing component…" which does not show an external interface in Figure 15.  *See* '158 patent at claim 1 and Fig. 15.  Moreover, the '158 patent specification Fig. 15 1508 A, B, C, and D disclose communication links and describe the term communication links which "may employ any protocol or combination of protocols including but not limited to the Internet Protocol."  *See* '158 at 16:28-44.



FIG.15

Likewise, as explained in GM's Opening Brief, the patent describes "interface" to be an input/output to a component consistent with Figure 15.  *See id.* at 22:53-23:10 ("In this

embodiment, the image post processor includes an encoder and an output interface … [t]he output of the encoder is supplied to the output interface, which provides encoding to supply an output signal … and a serial interface"). Thus, there is no clear and unmistakable disclaimer that would require the interface to be outside of the image capture device as GM argues. *See* Hernandez Reply Decl. at ¶¶ 11-16.

### P.    '475 Patent - "violation"

| IV's Construction | GM's Construction |
|---|---|
| Plain and ordinary meaning. | ***Old Construction***: non-compliance with a government law, rule, or regulation.<br>***New construction***: non-compliance with an applicable law relating to vehicle speed. |

The main issue in dispute for the term "violation" is whether the violation should be defined so that the non-compliance relates to speed only or whether it can relate to other forms of non-compliance. The Court need only look at GM's initial proposed construction, which did not include speed at all, to come to the conclusion that there is no clear and unmistakable disclaimer or definition for this term. *See* Dkt. 56, Ex. 2 at 2 (JCCS for "violation"). GM's argument that claim differentiation does not apply is just wrong. Claim 1 does not use the term "speed," but uses the term "violation." *See* '475 patent at claim 1. Claim 3 claims "[t]he method of claim 1, wherein the ***violation*** committed by the vehicle comprises a speed of the vehicle exceeding a posted speed limit." *Compare* '475 patent claim 1 *with* claim 3.

GM tries to distinguish the dependent claim by arguing "that there are other possible laws related to vehicle speed." This does not forestall the doctrine of claim differentiation since the term "violation" has been narrowed in the dependent claim to include "speed." Additionally, GM's argument makes IV's point. While it is true that there are other possible laws related to vehicle speed that a POSITA would know about, it is also true that a POSITA would understand based on the '475 patent specification that there are other possible violations, including based on

"location information," "velocity," *etc.* These are expressed in the specification as "variables" or "combination of these and other requested variables."

### Q.    '608 Patent - "first user preference" (Claims 1-8, 10-14)

| IV's Construction | GM's Construction |
|---|---|
| *Original Construction:* Plain and ordinary meaning which means "previously saved preference information." <br> *Alternative Construction:* previously saved user preference information. | *Original Construction:* "one of a set of preferences from a user preference profile." <br> *New Construction:* "user's previously saved preference information." (GM Reply at 15). |

GM abandoned its prior construction in favor of a revised construction that is confusing and is much more than the "slight tweak" that GM argues. GM Reply Br. at 16. GM's new construction appears to require an additional limitation where the previously saved preference information has to come from a specific user and not merely any user of the vehicle. '608 patent at claim 1. There is no requirement that the first user must be a specific user with a specific user profile in the '608 patent specification. Moreover, when read in context, the claim describes receiving a preference of a "first user," which merely provides antecedent basis of "the first user" described later in the claim. *Id*. Accordingly the claim reads "receiving ***a first user*** preference, a location of a mobile device of ***the first user.***" *Id*. Therefore, GM's revised construction should be rejected. As an alternative compromise construction, IV proposes that the plain and ordinary meaning is "previously saved user preference information."

### R.    '608 Patent – "a geographic area limitation" (Claims 1, 2, 5, 8, 9, 12)

| IV's Construction | GM's Construction |
|---|---|
| Plain and ordinary meaning. | *Original Construction:* "A geographic distance or shape supplied by a user for limiting the search for matching objects." <br> *Revised Construction:* "A geographic area supplied by a user for limiting the search for matching objects." (GM Reply at 16). |

GM abandons its prior construction, but continues to insert additional limitations into the claims that serve only to confuse the jury. GM Reply Br. at 16-17. GM's attempt to rewrite the

claims is improper. For example, GM adds a "search for matching objects" into the claim. But later in the claim there is already a step that requires "determining an object of the plurality of objects that matches the first user …" '608 patent at claim 1. This limitation is clear on its face and there is no need to include "search for matching objects" into the "geographic area" limitation. GM seemingly wants to insert redundancy and confusion into the claim for non-infringement purposes and provides no basis for doing so. GM's construction should be rejected.

### S.    '608 Patent – "substantially real-time updates" (Claims 3 & 10)

| IV's Construction | GM's Construction |
|---|---|
| Plain and ordinary meaning. | Indefinite. |

GM does not dispute that it did not timely raise this indefinite argument and cites no support showing that it preserved its invalidity theory. GM Reply Br. at 17-18. GM's late disclosed invalidity theory should be deemed waived. IV Resp. Br. at 27. GM restates its prior unsupported arguments and misrepresents a case that is inapposite. GM Reply Br. at 17-18. While a POSITA would readily understand the meaning of substantially real-time updates, GM argues that a POSITA would need the exact "allowable span of time between updates." GM Reply Br. at 18. IV identified numerous cases in its Brief that found near real time or substantially real time to be sufficiently definite.[4] IV Resp. Br. at 27-29; Hernandez Reply Decl. at ¶¶ 8-10.

GM conjures up a new argument that is wholly unsupported by the intrinsic record or the case law. GM Reply Br. at 17. GM argues that Federal Circuit affirmed a district court's finding of "real-time" in a claim as indefinite. *Id.* (*quoting RideApp Inc. v. Lyft, Inc*., 845 F. App'x 959, 960 (Fed. Cir. 2021) ("*RideApp*"). As an initial matter, GM never argued that the term "real-time" was indefinite, and accordingly that argument is a new ground for indefiniteness that was never

---

[4] For example "substantially" can account for a short delay associated with satellites or a delay associated with updates because of a connection availability. *Id.*; '608 patent at 8:1-10.)

argued. GM Opening Br. at 31-2 (arguing only the term "substantially" was indefinite). Moreover, GM grossly misconstrues *RideApp*. *RideApp* involved mean-plus function claims, which is not the case here.[5] *RideApp*, 845 F. App'x at 961. Neither party asserts that this term is a means plus function claim and that the patentee failed to provide sufficient structure. The Federal Circuit never held that as a rule, the term "real-time" is indefinite as GM suggests. GM Reply Br. at 17.

**T.    '466 Patent**

**1.    "first parameter," "second parameter," "third parameter," and "fourth parameter" (Claims 1, 3, 6, 8)**

| IV's Construction | GM's Construction |
|---|---|
| Plain and ordinary meaning, no construction necessary. | The "first parameter," "second parameter," "third parameter," and "fourth parameter" are different parameters for a channel. |

GM seeks to construe the claim to require the first, second, third, and fourth parameters "are different parameters." GM utterly fails to support its construction which is confusing and would not assist a jury in understanding the meaning of the claim term. (GM Reply Br. at 18.) GM's argument is based on its non-infringement position that certain parameters cannot be the same. GM's entire argument boils down to its argument that - "there would be no need to specify two different parameters – the claim would simply refer to a single parameter." (GM Reply Br. at 19.) This argument does not support a disclaimer that would prevent the parameters from being the same. As IV explained in detail, there is nothing in the '466 patent claim language or specification that forbids, for example, the second and third parameters from being, the same variable but with different values in different channels." (IV Resp. Br. at 18.) GM cannot limit the scope of the "variable" terms without showing a clear and unmistakable disclaimer and does not come close to showing one.

---

[5] In *RideApp*, the Federal Circuit affirmed that the "on-demand allocation" term was indefinite as a means-plus function claim for failing to disclose sufficient structure. *Id*. at 962-3.

2. **"wherein resources are allocated for data of each channel having a second parameter above zero prior to another channel's data for transmission having a third parameter less than or equal to zero" (Claims 1 and 6)**

| IV's Construction | GM's Construction |
|---|---|
| "wherein resources are allocated for a first set of data before any are allocated for a second set of data, where the first set of data is the data of each channel of a radio bearer having a second parameter above zero and the second set of data is another channel's data-for-transmission having a third parameter less than or equal to zero." | Plain and ordinary meaning. |

GM still has not proposed any construction for this term or identified any substantive reason why this Court should construe the disputed claim term any differently than the Eastern District of Texas did in the *IV v. Sprint* case. GM wrongly accuses IV of "not even bother[ing] to explain why the Court should adopt this construction." GM Reply Br. at 10. Not so. As it explained previously, IV proposes to adopt the Eastern District's construction because it is based on the intrinsic record and helpfully clarifies what the term means and what it does not mean. *See* IV Resp. Br. at 31-32. And contrary to GM's assertion, IV did not "completely rewrite its prior proposed construction." GM Reply Br. at 10. Rather, as explained, IV updated its proposal here to match the construction that the Eastern District ultimately adopted after agreeing with IV's positions in the *Sprint* case. *See* IV Resp. Br. at 31. IV's original and updated proposals here are consistent with one another. Further, GM's "ambiguity" argument falls flat. GM argues that under the Eastern District's construction it would ambiguous as to "whether the 'second parameter' in the claim refers to 'the data' or to 'each channel.'" GM Reply Br. at 10. But the allegedly ambiguous language of the Eastern District's construction essentially tracks the claim language, which GM itself admits "is clear on its face." *Id*.[6]

---

[6] The only difference is that the Eastern District's construction includes the words "of a radio bearer" after "each channel," but GM does not seem to raise an issue with that. The Eastern District included those words because it was simultaneously construing similar claim phrases from both the '466 patent and another related patent (the '018 patent), which, unlike the '466 patent, stated "each channel of a radio bearer." *Intell. Ventures II LLC v. Sprint Spectrum L.P.*,

U.    '628 Patent - "Store video data in the buffer"

| IV's Construction | GM's Construction |
|---|---|
| Plain and ordinary meaning. | Store video data in a loop buffer for a predetermined time of at least a few seconds to several minutes. |

The parties main dispute for the '628 patent term "store video data in the buffer" is whether there is a clear and unmistakable disclaimer that justifies the inclusion of the additional verbiage - "loop buffer for a predetermined time of at least a few seconds to several minutes."  GM argues that IV admitted that the specification does not refer to other types of buffers.  However, GM wrongfully argues that the disclosure of only one embodiment should limit the invention to only that embodiment and "disavows a broader claim scope."  (GM Reply Br. at 19-20.)  None of GM's references include a manifest exclusion or restriction.[7]  *See* '628 patent at 2:11-24; 3:53-62.  These cites even use permissive language and they merely describe Figure 1, an embodiment of the invention.  The patentee even explains that "those skilled and unskilled in the art will recognize the invention *is not so limited*" and "*[o]ther variations, modifications, and alternative embodiments may be made without departing from the spirit and scope of the present invention*."  *See* '628 patent at 11:4-9.  Thus, GM is not only wrong that the '628 patent specification includes manifest words or expressions of exclusion or restrictions, but the '628 patent specification shows the opposite intent.  Thus, unlike *Honeywell*, the '628 patent specification makes it clear that the patentee intends ***not*** to limit the present invention to disclosed embodiments.  *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006).  Moreover, the cases that GM relies on to ignore claim differentiation for claims 6, 8, and 10, which unlike claim 1, use term "loop buffer"

---

No. 2:17-CV-662-JRG-RSP, 2018 WL 6018625, at *3-4 (E.D. Tex. Nov. 16, 2018).  Because this case involves the '466 patent and not the '018 patent, IV would be amenable to deleting the "of a radio bearer" language from the Eastern District's construction.

[7] The case law is clear that restricting a claim term to disclosed embodiments requires "words or expressions of manifest exclusion or restriction."  *Pulse Elecs., Inc. v. U.D. Elec. Corp.*, 860 F. App'x 735, 737–38 (Fed. Cir. 2021).

are unavailing since the patentee did not describe the present invention "as a whole," but expressed

the desire not to limit the invention to disclosed embodiments.

## V.    '138 Patent - "wherein the selection of the data occurs using a first iteration and a second iteration" (Claims 1 and 8)

| IV's Construction | GM's Construction |
|---|---|
| Plain and ordinary meaning. | Wherein the selection of the data occurs by repeating the same steps twice. |
| Not Indefinite. | Indefinite. |

GM again proposes a construction that is inconsistent with the intrinsic record. Worse, the

proposed construction is meant to advance GM's indefiniteness theory. IV Resp. Br. at 34-35.

This is improper. GM should not be allowed to manufacture an indefiniteness argument based on

its proposed construction. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1327 (Fed. Cir. 2005).

GM's construction rests on its rewriting of the word "iteration" to require "repeating the

same steps twice." GM, in substance, admits that it seeks to interject a "same steps twice"

requirement into the claim. GM Reply Br. at 21. However, that construction is plainly

unsupported and confusing. IV Resp. Br. at 34-35; Dkt. 55-2 (Hernandez Decl.) at ¶¶ 169-174.

GM itself relies only on extrinsic evidence. Dkt. 47 at 38-39. Indeed, nothing in the intrinsic

records requires the "same steps" and the intrinsic record describes what each iteration entails.

IV Resp. Br. at 34-35; Dkt. 55-2 (Hernandez Decl.) at ¶¶ 169-174. The specification similarly

does not support GM's proposal. Dkt. 55-2 (Hernandez Decl.) at ¶ 172. GM's rewriting of the

claim also interjects confusion into it.[8] Under GM's construction a juror would be confused by

GM's use of both "step" and "iteration" in the claim.

Additionally, GM's argument is inconsistent. On the one hand GM argues that iterations

require repeating the same steps twice, while on the other hand arguing that the iteration steps

---

[8] For example, GM's construction simply seeks to confuse the claim by introducing "steps" and removing the antecedent basis for "the first iteration" and "the second iteration" later in the claim.

"input variables" and "outcomes" are "different." GM Reply Br. at 21.   With respect to indefiniteness, any confusion in the claim is a result of GM's construction.   The claim,  in and of itself describes "a first iteration" and "a second iteration."   As such GM's proposal should be rejected and the plain and ordinary meaning should govern.

### W.   Alleged Section 112, ¶6 Functional Claiming

#### 1.   '771 Patent: "local content module …" (claim 4)

| IV's Construction | GM's Construction |
|---|---|
| Not subject to §112(f), not indefinite. | Subject to §112(f); Indefinite. |

GM cannot rebut the presumption against invoking § 112, ¶ 6 or satisfy its burden of proving that claim 4 of the '771 patent is indefinite.  IV Resp. Br. at 35-37.  The crux of GM's position is that "memory alone does not perform the claimed 'storing' function" (GM Reply Br. at 22), but that is plainly wrong.  Claim 4 requires a "local content module that stores content that can be accessed by said client devices directly through said high-speed access point."  '771 patent at claim 4.  Memory devices do just that and, contrary to GM's argument, do not require specially programmed processors to practice the limitation as written in claim 4.  *See* Dkt 55-2 (Hernandez Decl.) at ¶¶ 72-75.  To require such a processor, GM mischaracterizes the claim language to read in an additional limitation of "writing" the content to memory and then "accessing" the content from the memory.  But claim 4 requires only that the local content module "stores content that can be accessed …," which is what memory devices do even at times when content is not actively being written on or accessed from them.  Hernandez Reply Decl. at ¶¶ 22-25.  GM's indefiniteness argument fails for the same reason.

### 2.    '318 Patent: "processor configured to …" (claim 8)

| IV's Construction | GM's Construction |
|---|---|
| Not subject to §112(f), not indefinite. | Subject to §112(f); Indefinite. |

GM cannot rebut the presumption against invoking § 112, ¶ 6 or satisfy its burden of proving claim 8 of the '318 patent indefinite.  IV Resp. Br. at 37-41.  GM's reply simply ignores that the claim language itself recites sufficient structure for the processor: the "processor" must be configured "to determine the length of time of the transport opportunity *based on a priority of the first queue*" and "the transmit opportunity corresponds to a length of time during which the transmitting station will transmit data frames from the first queue to a shared-communications channel[.]"  '318 patent at claim 8 (emphasis added).  Furthermore, the specification informs a POSITA about the processor's input, output, and how it works to carry out its claimed function, including the processor's calculation of $T_i$ (*i.e.,* length of time of a transmit opportunity associated with application i).  *See* IV Resp. Br. at 39-41 (discussing '318 patent at 3:25-5:3, Fig. 3).  GM's arguments to the contrary are without merit.  See Williams Reply Decl. at ¶¶ 8-14.

### 3.    '356 Patent: "processor … configured … to …" (claim 1)

| IV's Construction | GM's Construction |
|---|---|
| Not subject to §112(f), not indefinite. | Subject to §112(f); Indefinite. |

GM cannot rebut the presumption against invoking § 112, ¶ 6 or satisfy its burden of proving claim 1 of the '356 patent indefinite.  IV Resp. Br. at 41-44.  As previously explained, a computer processor is a well-known class of structures, and claim 1 provides sufficient information about the processor's configured operations, inputs, and outputs, including its receipt of resource allocation information, transmission of data in assigned time intervals over a physical uplink shared channel, and, when not sending data, transmission of a signal based on the resource allocation information over an uplink physical control channel.  *Id.* at 42-43.  Without support, GM wrongly deems this structural information insufficient.  Similarly, GM incorrectly dismisses

the specification's disclosure as insufficient and wrongly asserts that "IV's discussion of a GGSN device is nothing more than unsupported attorney argument." GM Reply Br. at 25. As indicated in IV Brief, the GGSN device discussions were based on the intrinsic record and the opinions of IV's expert Dr. Williams thereon.[9] *See* IV Resp. Br. at 41, 43; '356 patent at 1:54-60, 2:34-3:3 3:42-52, 7:62-8:4, 8:48-9:5, Figs. 1 & 5. Moreover, in insisting that no algorithm is disclosed, GM applies an overly narrow interpretation of what an algorithm can be, when in fact "[a]n algorithm in the computer arts is a broad concept used 'to identify a step-by-step procedure for accomplishing a given result,' and may be expressed 'in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure.'"[10]

### 4. '641 Patent: "circuitry configured to …" (claim 11) / "mobile station is configured to …" (claims 11 and 25)

| IV's Construction | GM's Construction |
|---|---|
| Not subject to §112(f), not indefinite. | Subject to §112(f); Indefinite. |

GM cannot rebut the presumption against invoking § 112, ¶ 6 or satisfy its burden of proving claims 11 and 25 of the '641 patent indefinite. IV Resp. Br. at 44-47. Both "circuity" and "mobile station" have well-understood structural meanings (*id*.), a fact GM does not even attempt to rebut.[11] As explained, the claims do just that. IV Resp. Br. at 44-47; Williams Decl. at ¶¶ 88-95. Moreover, the specification provides ample structural details about the claimed mobile station. IV Resp. Br. at 47; Williams Decl. at ¶ 97 (discussing '641 patent at 4:5-16, 5:7-17, 6:1-31).

---

[9] Dr. Williams explained how the '356 patent's specification and figures discloses the claimed processor, how it is connected and interacts with other components and processes data transmitted by the GGSN. Williams Decl. at ¶¶ 108-110.

[10] *See Realtime Data, LLC v. Rackspace US, Inc.,* No. 6:16-cv-961, 2017 WL 2590195, at *16-17 (E.D. Tex. June 14, 2017) (quoting *Typhoon Touch Techs., Inc. v. Dell, Inc.,* 659 F.3d 1376, 1385 (Fed. Cir. 2011); *Finisar Corp. v. DirecTV Grp.,* 523 F.3d 1323, 1340 (Fed. Cir. 2008)).

[11] Nor does GM distinguish the *Linear Technology* line of cases, which held that "circuit"/"circuitry" connotes sufficient structure to avoid means-plus-function treatment when the claim describes the circuit's operation, including its input, objective, and output. *See* IV Resp. Br. at 44-46.

### 5. '158 Patent: "processing component … configured to" (claims 1, 5, and 9)

| IV's Construction | GM's Construction |
|---|---|
| Not subject to §112(f), not indefinite. | Subject to §112(f); Indefinite. |

GM cannot rebut the presumption against invoking § 112, ¶ 6 or satisfy its burden of proving claims 1, 5, and 9 of the '158 patent indefinite. IV Resp. Br. at 47-51. GM incorrectly argues that IV confirms that § 112(f) applies (GM Reply Br. at 26), but, as explained previously, the term "processing component" itself connotes structure to a POSITA, and the claims provide further structure by describing the processing component's input, objective, and output. IV Resp. Br. at 47-49. GM does not dispute any of that and instead tries to impose an unsupported "specific software or programming" requirement for avoid means-plus-function treatment. But as the numerous (and still unrebutted) cases cited by IV indicate, courts regularly terms like "processing component" not to invoke § 112, ¶ 6 without having to meet GM's heightened standard.

GM's indefiniteness argument is similarly unavailing. While GM accuses IV of failing to identify any algorithm and "block cit[ing] more than 10 specification columns and 9 figures" (GM Reply Br. at 27), in reality IV Brief and accompanying expert declaration from Dr. Hernandez-Mondragon went through the various portions of the intrinsic record in detailed fashion over several pages, showing how each cited portion or embodiment described and supported the claimed processing component's operations of controlling and determining integration times and combining data to form images. IV Resp. Br. at 48-51; Hernandez Decl. at ¶¶ 156-157, 160-165. In the context of the '158 patent, a POSITA would understand the specification to disclose an algorithm for the claimed processing component's recited functions. *See* Hernandez Reply Decl. at ¶¶ 17-18.

### 6.    '475 Patent: "processing module configured to …" (claim 15)

| IV's Construction | GM's Construction |
|---|---|
| Not subject to §112(f), not indefinite. | Subject to §112(f); Indefinite. |

GM cannot rebut the presumption against invoking § 112, ¶ 6.  IV Resp. Br. at 51-56. Claim 15 describes sufficient structure for the claimed "processing module," which itself connotes structure, by identifying the processing module's operations, including its input (information about the vehicle from the information module), its function (determining whether the vehicle committed a violation), and its output (a determination that a violation occurred, to be sent by the transmission module to a remote computer system).  *Id*. at 52-53.  GM does not dispute the content of this disclosure or distinguish IV's cited case law, and instead offers only *ipse dixit* to assert that this disclosure is simply not enough.  GM Reply Br. at 27-28.  GM's argument fails to overcome the presumption against invoking § 112, ¶ 6. GM now appears to have withdrawn its indefiniteness position, arguing instead in its Reply Brief that if § 112, ¶ 6 applies, the specification discloses "corresponding structure … for performing the claimed function …"  GM Reply Br. at 28.  But GM's new position is irrelevant because § 112, ¶ 6 is inapplicable.

### 7.    '628 Patent ("processor configured to …") Claim 1

| IV's Construction | GM's Construction |
|---|---|
| Not subject to §112(f), not indefinite. | Subject to §112(f); Indefinite. |

GM cannot rebut the presumption against invoking § 112, ¶ 6 or satisfy its burden of proving claim 1 of the '628 patent indefinite.  IV Resp. Br. at 56-59.  As with the other "processor" claim terms, the term "processor" itself connotes structure, and the claim provides further structural support by identifying the processor's operations, including its input, objective, and output.  *Id*. at 56-57.  GM's arguments to the contrary lack support and are without merit.

GM's indefiniteness position similarly lacks merit.  In IV Brief, IV and its expert described in detail how the '628 patent's specification and figures disclosed the structure of the claimed

"processor" corresponding to the recited function, including through schematics, examples, and a flow chart.  IV Resp. Br. at 57-58; Hernandez Decl. at ¶¶ 117-124.  GM's argument that these disclosures are somehow insufficient is meritless.  Hernandez Reply Decl. at ¶¶ 19-21.  Indeed, to support its strained indefiniteness position, GM mischaracterizes IV Brief.  GM argues that "IV and its expert effectively admit that there is no algorithm disclosed in the '628 patent" based solely on the completely innocuous fact that IV's expert wrote that a "POSITA *would find* a sufficient algorithm for configuring the claimed 'processor' to carry out the recited functions.'"  GM Reply Br. at 29 (quoting Hernandez Decl. ¶ 124; emphasis added by GM).  In no way does that statement support GM's position or constitute the admission GM contends it does.  A POSITA is a hypothetical construct of a person at the time of the invention, and it is common parlance to use the auxiliary verb "would" when describing a POSITA's actions, knowledge, or understanding.[12]

### 8.    '138 Patent ("processor is configured to") (Claim 1)

| IV's Construction | GM's Construction |
|---|---|
| Not subject to §112(f), not indefinite. | Subject to §112(f); Indefinite. |

GM cannot rebut the presumption against invoking § 112, ¶ 6 or satisfy its burden of proving claim 1 of the '138 patent indefinite.  IV Resp. Br. at 59-60.  As previously explained, the claim's recited configurations for the processor connote sufficient structure, describing how the processor will interact with the transmitter and circuitry to send or receive a variety of information (parameters, messages, allocations of uplink resources, or data signals) and how the processor will determine a plurality of buffer occupancies associated with one or more radio bearers and select data from the radio bearers based on received parameters or on buffered data for respective radio

---

[12] *See, e.g., Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc) ("We have made clear, moreover, that the ordinary and customary meaning of a claim term is the meaning that the term *would have* to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." (emphasis added)).

bearers. *Id.*; Hernandez Decl. at ¶¶ 169-174.  Again, GM's generalized arguments to the contrary

lack support and are without merit.  GM's indefiniteness argument also fails.  As explained, the

'138 patent discloses the structure, including an algorithm, for the claimed processor to carry out

its recited functions. *Id.* While GM tries to argue that the patent's disclosure, such as in Fig. 6 and

the corresponding description in the specification, does not constitute an "algorithm," it plainly

does qualify as an algorithm that is sufficiently linked to the claimed functions, and is not, as GM

contends, "simply a description of the outcome of the claimed functions."  GM Reply Br. at 30.

## III.    <u>CONCLUSION</u>

IV respectfully requests that the Court adopt its proposed constructions.

Dated:  September 23, 2022              Respectfully submitted,

By: */s/ Jonathan K. Waldrop*
    Jonathan K. Waldrop (CA Bar No. 297903)
    (Admitted in this District)
    jwaldrop@kasowitz.com
    Darcy L. Jones (CA Bar No. 309474)
    (Admitted in this District)
    djones@kasowitz.com
    Marcus A. Barber (CA Bar No. 307361)
    (Admitted in this District)
    mbarber@kasowitz.com
    John W. Downing (CA Bar No. 252850)
    (Admitted in this District)
    jdowning@kasowitz.com
    Heather S. Kim (CA Bar No. 277686)
    (Admitted in this District)
    hkim@kasowitz.com
    ThucMinh Nguyen (CA Bar No. 304382)
    (Admitted in this District)
    tnguyen@kasowitz.com
    **KASOWITZ BENSON TORRES LLP**
    333 Twin Dolphin Drive, Suite 200
    Redwood Shores, California 94065
    Telephone: (650) 453-5170
    Facsimile: (650) 453-5171

    Mark D. Siegmund (TX Bar No. 24117055)
    mark@swclaw.com
    **STECKLER WAYNE CHERRY &**
    **LOVE PLLC**
    8416 Old McGregor Road
    Waco, TX 76712
    Telephone: (254) 651-3690
    Facsimile: (254) 651-3689

    Gregory Phillip Love (TX Bar No. 24013060)
    greg@swclaw.com
    **STECKLER WAYNE CHERRY &**
    **LOVE PLLC**
    107 East Main Street
    Henderson, TX 75652
    Telephone: (903) 212-4444
    Facsimile: (903) 392-2267

    **Attorneys for Plaintiffs**
    **INTELLECTUAL VENTURES I LLC and**
    **INTELLECTUAL VENTURES II LLC**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served or delivered electronically to all counsel of record on this 23rd day of September, 2022, via the Court's CM/ECF System.

/s/ Jonathan K. Waldrop
Jonathan K. Waldrop