# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC and INTELLECTUAL VENTURES II LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 6:21-cv-01088-ADA |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| GENERAL MOTORS COMPANY and, GENERAL MOTORS LLC, | ) ) ) | |
| Defendants. | ) ) | |

## [SEALED] MEMORANDUM AND OPINION ORDER
## DENYING DEFENDANTS' MOTION TO TRANSFER VENUE

Before the Court is Defendants General Motors Company and General Motors LLC's ("GM") Motion to Transfer Venue under 28 U.S.C. § 1404(a) to the Eastern District of Michigan. ECF No. 34. Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC ("IV") filed their Response on June 2, 2022 (ECF No. 43), to which GM filed their Reply on June 16, 2022 (ECF No. 45). After being granted a leave, IV filed a Sur-Reply on July 25, 2022 (ECF No. 48-1). After careful consideration of the parties' briefs and the applicable law, the Court **DENIES** GM's Motion to Transfer to the Eastern District of Michigan.

## I. FACTUAL BACKGROUND

Plaintiffs IV filed this lawsuit accusing Defendants GM of infringing U.S. Patent Nos. 6,832,283 ("the '283 Patent"), 7,891,004 ("the '004 Patent"), 9,934,628 ("the '628 Patent"), 9,291,475 ("the '475 Patent"), 7,382,771 ("the '771 Patent"), 9,232,158 ("the '158 Patent"), 9,681,466 ("the '466 Patent"), 10,292,138 ("the '138 Patent"), 8,953,641 ("the '641 Patent"), 8,811,356 ("the '356 Patent"), 7,684,318 ("the '318 Patent"), and 9,602,608 ("the '608 Patent")

(collectively, the "Asserted Patents"). ECF No. 1 ¶ 1. IV alleges that GM makes, uses, performs, tests, leases, sells, offers for sale and/or imports into the United States vehicles that embody products and/or services that infringe the technology of the Asserted Patents. *Id.* ¶¶ 67, 83, 100, 115, 129, 143, 156, 173, 193, 216, 233, 249. The accused technologies are GM's "wireless communication system solutions and services" found in product offerings such as "Connected Services," "OnStar," and "Telematics Control Module[s]" which "are included in various automobiles managed by General Motors including but not limited to: Buick, Cadillac, Chevrolet, and GMC product lines." *Id.* ¶¶ 29, 90–91.

General Motors Company is a Delaware corporation. *Id.* ¶ 5. General Motors LLC is a Delaware limited liability company with its headquarters located in Detroit, Michigan. *Id.* ¶ 6; ECF No. 34 at 3. GM also maintains a physical presence in Austin, Texas. ECF No. 1 ¶¶ 6–7. IV are Delaware limited liability companies having their principal place of business located at 3150 139th Avenue SE, Bellevue, Washington 98005. ECF No. 1 ¶¶ 2–3.

## II. LEGAL STANDARD

In patent cases, motions to transfer under 28 U.S.C. § 1404(a) are governed by the law of the regional circuit. *In re TS Tech USA Corp.*, 551 F.3d 1315, 1319 (Fed. Cir. 2008). Under § 1404 (a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). The party moving for transfer carries the burden of showing good cause. *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 314 (5th Cir. 2008) (hereinafter "*Volkswagen II*") ("When viewed in the context of § 1404 (a), to show good cause means that a moving party, in order to support its claim for a transfer,

must…clearly demonstrate that a transfer is '[f]or the convenience of parties and witnesses, in the interest of justice.'") (quoting 28 U.S.C. § 1404(a)).

"The preliminary question under Section 1404(a) is whether a civil action might have been brought in the [transfer] destination venue." *Volkswagen II*, 545 F.3d at 312 (internal quotations omitted). If the inquiry is satisfied, the Court then determines whether a transfer is proper by analyzing and weighing public and private interest factors. *Action Indus., Inc. v. U.S. Fid. & Guar. Co.*, 358 F.3d 337, 340 (5th Cir. 2004); *In re Apple Inc.*, 979 F.3d 1332, 1338 (Fed. Cir. 2020) (applying Fifth Circuit law).

The private factors include: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy[,] expeditious and inexpensive." *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) (hereinafter "*Volkswagen I*") (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1982)). The public factors include: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws of the application of foreign law." *Id.*

Defendants should expect and accept some inconvenience when haled into Court. *Def. Distributed v. Bruck*, 30 F.4th 414, 433 (5th Cir. 2022). The burden that a movant must carry is not that the alternative venue is more convenient, but that it is *clearly* more convenient. *Volkswagen II*, 545 F.3d at 314 n.10. Although the plaintiff's choice of forum is not a separate factor entitled to special weight, respect for plaintiff's choice of forum is encompassed in the movant's elevated burden to "clearly demonstrate" that the proposed transferee forum is more

convenient than the forum in which the case was filed. *Id.* at 315. "[T]he standard is not met by showing one forum is more likely than not to be more convenient, but instead the party must adduce evidence and arguments that clearly establish good cause for transfer based on convenience and justice." *Def. Distributed*, 30 F.4th at 433. While "clearly" more convenient is not necessarily equivalent to the "clear and convincing" evidence standard, the moving party "must show materially more than a mere preponderance of convenience, lest the standard have no real or practical meaning." *Quest NetTech Corp. v. Apple, Inc.*, No. 2:19-cv-118, 2019 WL 6344267, at *7 (E.D. Tex. Nov. 27, 2019).

### III. DISCUSSION

The threshold determination in the § 1404(a) analysis is whether this case could initially have been brought in the destination venue—the Eastern District of Michigan ("EDMI"). *Volkswagen II*, 545 F.3d at 312. GM asserts that this case could have originally been brought in the EDMI because its headquarters are in Detroit, Michigan. ECF No. 30 at 3. IV does not dispute this point. *See* ECF No. 43. This Court finds that venue would have been proper had IV originally filed this case in the EDMI. Thus, the Court proceeds with its analysis of the private and public interest factors to determine whether the EDMI is clearly more convenient that the Western District of Texas ("WDTX").

### A. Private Interest Factors

#### 1. Cost of Attendance of Willing Witnesses

"The convenience of witnesses is the single most important factor in the transfer analysis." *Fintiv*, 2019 U.S. Dist. LEXIS 171102, at *17. The Fifth Circuit has established the "100-mile rule," providing that "[w]hen the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses

4

increases in direct relationship to the additional distance to be traveled." *Volkswagen I*, 371 F.3d at 204–05.

The Federal Circuit has held that, where witnesses would be required to travel a significant distance no matter where they testify, those witnesses will only be slightly more inconvenienced by having to travel to, for example, California, compared to Texas. *In re Apple*, 979 F.3d at 1342 (discussing witnesses traveling from New York) (citing *Volkswagen II*, 545 F.3d at 317); *In re Genentech*, 566 F.3d at 1344 (stating that the 100-mile rule should not be "rigidly" applied in the context of foreign witnesses). It has opined elsewhere that "[t]he comparison between the transferor and transferee forum is not altered by the presence of other witnesses and documents in places outside both forums." *In re Toyota Motor Corp.*, 747 F.3d 1338, 1340 (Fed. Cir. 2014); *In re Google LLC*, No. 2021-170, 2021 U.S. App. LEXIS 29137, at *12 (Fed. Cir. Sept. 27, 2021) ("[W]hen there are numerous witnesses in the transferee venue and the only other witnesses are far outside the plaintiff's chosen forum, the witness-convenience factor favors transfer."). And, in yet other cases, it has considered only hypothetical travel-time statistics, and not distance, under this factor. *See, e.g.*, *In re Google LLC*, 2021 U.S. App. LEXIS 29137, at *12.

The Federal Circuit has recognized that "an employer's cooperation in allowing an employee to testify may diminish certain aspects of inconvenience to the employee witness (for instance, the employee is not acting contrary to their employer's wishes)." *In re Hulu,* No. 2021 U.S. App. LEXIS 22723, at *13. Elsewhere it has stated that inconvenience is not attenuated *at all* when the witnesses are employees of the party calling them. *See, e.g.*, *In re Juniper Networks, Inc.*, 14 F.4th 1313, 1319 (Fed. Cir. 2021).

The Court holds that this factor is neutral because of the number of relevant witnesses in the both the EDMI and this District.

a)      EDMI GM Personnel

GM argues this factor favors transfer because the EDMI "is home for a vast majority of GM's witnesses." ECF No. 34 at 10–11. In support of this argument, GM provides a declaration from Mr. Matthew Przybylski, an Executive Director of Infotainment and Connectivity at General Motors LLC. ECF No. 34-2 (the "Przybylski Decl.") ¶ 1. Mr. Przybylski testifies that "GM has nearly 50,000 employees across 31 facilities in the state of Michigan" and that the facilities include the GM Global Headquarters in Detroit, Michigan, the GM Global Technical Center in Warren, Michigan, and multiple assembly and operations centers. *Id.* ¶ 4. For each of the accused technologies, GM identifies seven individuals in the EDMI—███████████ ████████████████████████████████████████ ████████—most knowledgeable about the design, development, implementation, and operation of the allegedly infringing hardware and software. ECF No. 34 at 10 (citing Przybylski Decl. ¶¶ 7–12).

In the Court's judgment, the Przybylski Declaration establishes that these seven named witnesses possess relevant and material knowledge for whom the EDMI would be a more convenient venue. IV does not argue against that these seven witnesses identified by GM in the EDMI possess relevant and material knowledge for whom the EDMI would be a more convenient venue. ECF No. 43 at 18–19. To be sure, the Court also recognizes that GM has established that an unknown number of "GM employees with primary responsibility for marketing of the accused technologies are located in the Eastern District of Michigan." ECF No. 34 at 10–11 (citing ECF No. 34-3 ("Stewart Decl." ¶ 4).

b)      Texas-based GM Personnel

GM argues that "[a]fter a diligent review, none of the GM employees identified as likely having knowledge relevant to the case is located in Texas." ECF No. 34 at 11. GM contends that the employees of GM's various Texas facilities are at most of tangential relevance to this case. *See id. First,* GM asserts that the "Austin IT Center has only tangential relevance to the instant litigation." *Id.* GM admits that several employees in the Austin IT Center "possess information regarding the analysis of data collected from the Telematics Interface Control Module and OnStar and Connected Services." *Id.* And GM further admits that ███████████████████

████████████████████████████████████████████

███████████████████████████████████" *Id.* While GM admits that "these technologies are arguably mentioned in IV's Complaint," GM contends that they "are not central of any infringement claim." *Id.* And GM argues "even if [such knowledge were] relevant, [it] would not be unique." *Id. Second,* GM argues that for the remainder of GM's Texas facilities, they "have no information relevant to the design, development, or implementation of the accused technology in this case" and that none of the "employees at these locations involved in the marketing, licensing, or financial aspects of the accused technology." *Id.*

In response, IV argues that this factor weighs against transfer because the WDTX will be more convenient for a larger number of party and non-party witnesses compared to the EDMI. ECF No. 43 at 18. Specifically, IV argues that it "was able to locate 55 potential party and non-party witnesses that are located in or within 100 miles from the WDTX and will find appearing for trial at the Waco Courthouse convenient and inexpensive, including:

> (i) 7 IT Innovation Center executives, 5 employees who made public statements about their deep involvement with the infringing

> technologies, and 24 Global Product Group employees (Waldrop
> Decl., Ex. E); (ii) 4 OneStar advisors who work at the Austin
> Customer Engagement Center (Waldrop Decl., Ex. F); (iii) 5 Fort
> Worth Distribution Center employees distributing infringing parts
> (Waldrop Decl., Ex. I); (iv) 8 Arlington Assembly Plant employees
> who make GM SUVs with the infringing technologies (Waldrop
> Decl., Ex. L); (v) the inventor of the '158 Patent (Dkt.34-1 at 2);
> and (vi) IV's witness who finds a trial in the WDTX more
> convenient than a trial in the EDMI (Krishnankutty Decl., ¶ 8).

*Id.* While IV admits that "these 55 potential witnesses have some overlapping knowledge," it

argues that "they are far more than the 7 individuals that GM identified in the Motion." *Id.*

IV then contends that GM's assertion that the employees at the Arlington Assembly and

Fort Worth Distribution Center do not have relevant information in this case is "nonsensical"

because "these facilities make and sell vehicles with the infringing technologies." *Id.* at 19. IV

argues that GM's assertion is not supported by the declaration of Mr. James Jacobson, a Director

in GM's Digital Business Technology Team (ECF No. 34-4 ¶ 1 ("Jacobson Decl."). *Id.*

According to IV, Mr. Jacobson's declaration "only lists those facilities and does not make

statements about the employees' knowledge." *Id.* (citing Jacobson Decl., ¶¶ 19–24). The Court

agrees with IV that the Jacobson declaration does not support GM's bald proclamation that GM's

Texas facilities contain no personnel with relevant information.

In reply, GM argues that the "central nervous system of its development and engineering

resides in only one place: Michigan." ECF No. 45 at 3. *First*, GM argues that it "identified the

seven GM employees most knowledgeable about the design, development, implementation and

operation of the allegedly infringing hardware and software." *Id. Second,* GM responds that it

provided IV a list of the 70 individuals most knowledge of the accused products and that

"[s]ixty-six [of those individuals]—over 94%—are located in Michigan" and that "[n]one are in

Texas." *Id.* at 3–4. GM further replies that the accused products were developed in Michigan

because Mr. Jacobson testified that the accused products were developed in Michigan. *Id.* at 4

(citing ECF No. 45-1 at 107:20–108:7, 138:11–22, 145:1–146:10, 98:25–99:25). *Third,* GM replies that for technologies designed or developed by third parties, most suppliers are in EDMI. *See id.* However, GM does not argue that any of these suppliers are willing witnesses. Thus, the Court will not consider these various third-party suppliers under this factor.

GM then replies to IV's identification of employees in Texas. *Id.* at 6–7. GM argues that "[w]hile GM employees in Austin may collect and analyze data collected from GM vehicles, the asserted patents do not cover these activities." *Id.* Thus, GM contends that GM employees performing these activities are not relevant. *Id.* at 7. Then GM replies that while "IV claims OnStar was "developed" in Austin[,] IV is wrong [because] GM developed OnStar software in Michigan." *Id.* According to GM, the "Austin-based 'development' under the OnStar 'umbrella' was ████████████████████████—neither of which is accused of infringement." *Id.* GM goes on to contend that "GM employees working on ████████████████████ ████████████████████, are similarly irrelevant." *Id.* GM further replies that GM Austin employees "work[ing] on ████████████████████████" are not relevant" because "[t]he '475 and '608 patents do not claim 'building maps' or any use of 'mapping software'; at most they claim specific implementations using GPS." *Id.*

GM then argues that their personnel at their various facilities throughout Texas identified by IV are irrelevant. *See id.* at 8–10. *First,* GM argues that its Fort Worth Part Distribution Center employees are irrelevant because "i[t] is literally a 'warehouse.'" *Second,* GM argues that its Arlington Assembly Plant is irrelevant because "[t]he men, women (and robots) who physically assemble GM vehicles are highly unlikely to know about the precise technical operations of the hardware and software therein. IV makes no credible argument they have such knowledge." *Id. Third,* GM argues that the "Austin Customer Engagement Center no longer

exists[;] . . . . [t]he facility closed and its employees are remote." *Id.* According to GM, "[a]t most, a few agents may have answered OnStar calls or served an OnStar advisor." *Id. Fourth*, GM contends that General Motors Financial Company, Inc. is a financial services company that provides auto loan financing through dealers across the U.S. and Canada, and that "Defendants have "very little" interaction with GM Financial." *Id.* at 9. According to GM, the relevant financial information is in Michigan. *Id.*

In its sur-reply, IV responds that GM's new argument that GM's presence in the WDTX has no relevance to this case is unsupported. ECF No. 48-1 at 2. According to IV, GM does not deny the following: (1) "GM's prior sworn statements that the Austin Division's DBTT employees have knowledge about multiple infringing technologies"; (2) "GM's prior statement that Austin employees work on the accused technologies referenced in IV's complaint and have knowledge about "███████████████████████████████████████████████

██████████████████████████████████████████████████████"; (3) "The fact that there are at least 7 executives who run the Austin Division dedicated to the accused technologies; and (4) "The fact that at least 6 employees publicly shared their specific work experience with the accused technologies." *Id.* at 2–3.

IV then replies that GM is "wrong" about its contention that certain Austin projects involving ████████████████████████████████████████ are not relevant to the asserted patents. *Id.* at 3. *First*, IV argues that various infringing software and hardware automobile technologies like OnStar, Connected Services, Wi-Fi/hotspot, Connected Navigation and Telematics Control Module are worked on in Austin. *Id. Second,* IV argues that "even if the Austin employees do not work on certain accused products, they undoubtedly do work on

products that monetize IV's technologies and generates additional streams of revenue for GM." *Id.* Thus, IV contends that discovery on this work is relevant to damages.

IV further attempts to rebut GM's arguments about General Motors Financial Company, Inc. and the Austin Engagement Center. *Id.* at 5. The Court agrees with IV on the Austin engagement center but disagrees on the GM Financial witnesses in Fort Worth. GM claims that "the Austin Customer Engagement Center no longer exist" (ECF No. 45 at 8), but GM does not deny that the advisors are still located in the WDTX and work remotely on the OnStar technology. However, since GM Financial is a non-party to this case, the Court will consider it under the compulsory witness factor.

Upon consideration of the above evidence presented by both parties, the Court finds that some of the WDTX GM employees identified by IV are relevant and material to this case. In its Motion, GM admits that some of its employees are "involved in the design of a ███████████ ████████████████████████████████████████████████████ ███████████████████████████." ECF No. 34 at 11. Then GM goes on to admit that these technologies are mentioned in IV's complaint but contends that "they are not central of any infringement claim." *Id.* Critically, GM does not contend that these technologies are absent from IV's infringement claims—just that they are not central. *See id.* That GM goes on to argue throughout its Motion and its Reply that the work it does in the WDTX is irrelevant to this case is plainly contradictory. *See, e.g.*, ECF No. 45 at 7 ("None of the GM employees in Austin working on OnStar are relevant to this matter"). Similarly, GM's argument regarding the Austin employees "[w]orking on ████████████" being irrelevant is unpersuasive. Whether the '475 and '608 patents do not claim "████████████████████████" is not an issue

11

that this Court must decide in this Motion and may be incorrect. *See, e.g.*, '475 Patent cl. 9 ("the information about the vehicle comprises one or more of a location of the vehicle").

IV identified 24 potential GM employee-witnesses who work in the IT Innovation Center's Global Product Group in Austin, and according to GM, "these employees work on ███████████████████████████████████." ECF No. 43 (citing Jacobson Tr. at 103:21–104:3). As such, the Court finds that these seven witnesses identified by GM in the EDMI possess relevant and material knowledge for whom the EDMI would be a more convenient venue. Moreover, the Court also finds that IV has shown and GM has not sufficiently rebutted that there are a number of GM executives and software engineers in Austin that are relevant and material to this case. *See, e.g.*, ECF No. 43 at 7–8. While the Court is not convinced that IV has shown that all these employees are relevant and material to this case, IV has shown at least a majority of these employees are.

As to the remaining GM employees that IV identified in Texas, the Court finds that at least one of the employees identified by IV at each of the Fort Worth Parts Distribution Center and the Arlington Assembly is likely to be relevant and material to this case. However, most of these witnesses would be duplicative of those already identified by the parties.

c)     IV Personnel

IV contends that this Court should weigh against transfer its witness who finds a trial in the WDTX more convenient than at trial in the EDMI. ECF No. 43 at 18. In support of its argument, IV relies on the declaration of Mr. Subash Krishnankutty, the Vice President of Licensing at IV. ECF No. 43-1 ("Krishnankutty Decl.") ¶ 1. In his declaration, Mr. Krishnankutty declares that he finds "a trial in the Western District of Texas more convenient than a trial in the Eastern District of Michigan." *Id.* ¶ 8.

GM argues that Plaintiffs are both Delaware LLCs with a principal place of business is in Bellevue, Washington. ECF No. 34 at 12 (citing ECF No. 1 ¶¶ 2–3). Thus, GM asserts that IV has no known connection to this District, let alone Texas—no facilities, no known witnesses, and no business operations (aside from three pending lawsuits). *Id.*

IV proposes that this Court ignore a plaintiff's inconvenience just so long as the plaintiff is willing to too. Stated another way, the Court should simply accord weight to a plaintiff's chosen venue, regardless of how truly inconvenient it is to the plaintiff. But a plaintiff's choice of venue is already baked into the movant's burden. *See Volkswagen II*, 545 F.3d at 314 n.10 (citing *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 127 S. Ct. 1184, 1191, 167 L. Ed. 2d 15 (2007)). Accordingly, the Court will not weigh the convenience of a plaintiff's witnesses against transfer under this factor merely because the plaintiff attests that travel to this District would not represent an inconvenience upon a single witness with no apparent connection to this District other than this lawsuit.

### d) Remaining willing witnesses

The only other remaining witness that the parties address under the willing witness factor is the inventor of the '158 Patent—Feng-Quin Sun—who lives in Austin. *See* ECF No. 43 at 3. Yet because neither party has introduced any evidence that this inventor is a willing witness, this witness is presumed unwilling and is instead considered under the compulsory process factor.

### e) Conclusion

GM named seven GM employees in the EDMI it contends are most knowledgeable about allegedly infringing products. GM further named 66 individuals who *may* be knowledgeable in the EDMI. By contrast, IV has identified 7 DBTT executives in the Austin Division dedicated to the accused technologies; 5 employees who publicly admitted working on the accused

technologies; and 24 Global Product Group employees who as shown above are relevant to this case. IV further identified 4 Customer Engagement Center advisors; 5 Fort Worth Distribution Center employees; and 8 Arlington Plant engineers, but most likely only a few of these witnesses would be relevant.

On balance, the Court finds that this factor is neutral with regard to transfer. Both parties have adequately demonstrated that the EDMI and the WDTX have many witnesses who are relevant and material to this case. Both parties have also equally identified and relied upon numbers of witnesses that are likely irrelevant or duplicative. Therefore, the Court finds that this factor is neutral in regard to transfer to the EDMI.

### 2. Availability of Compulsory Process

Under the Federal Rules, a court may subpoena a witness to attend trial only (a) "within 100 miles of where the person resides, is employed, or regularly transacts business in person"; or (b) "within the state where the person resides, is employed, or regularly transacts business in person, if the person . . . is commanded to attend a trial and would not incur substantial expense." Fed. R. Civ. P. 45(c)(1)(A), (B)(ii); *Gemalto S.A. v. CPI Card Grp. Inc.*, No. 15-CA-0910, 2015 WL 10818740, at *4 (W.D. Tex. Dec. 16, 2015). Under this factor, the Court focuses on non-party witnesses whose attendance may need to be secured by a court order. *Fintiv*, 2019 U.S. Dist. LEXIS 171102, at *14 (citing *Volkswagen II*, 545 F.3d at 316). This factor "weigh[s] heavily in favor of transfer when more third-party witnesses reside within the transferee venue than reside in the transferor venue." *In re Apple, Inc.*, 581 F. App'x 886, 889 (Fed. Cir. 2014). When "there are several witnesses located in the transferee forum and none in the transferor forum," this factor favors transfer. *In re Google*, No. 2021-171, 2021 WL 4592280, at *5 (Fed. Cir. Oct. 6, 2021).

14

The Federal Circuit has held that, under Fifth Circuit law, "when there is no indication that a non-party witness is willing, the witness is presumed to be unwilling and considered under the compulsory process factor." *In re HP Inc.*, No. 2018-149, 2018 WL 4692486, at *3 n.1 (Fed. Cir. Sept. 25, 2018); *see also In re Hulu, LLC,* No. 2021-142, 2021 U.S. App. LEXIS 22723, at *10 (Fed. Cir. Aug. 2, 2021) ("[W]here . . . the movant has identified multiple third-party witnesses and shown that they are overwhelmingly located within the subpoena power of only the transferee venue, this factor favors transfer even without a showing of unwillingness for each witness."). Further, this Court cannot "discount" third-party entities having pertinent information in the transferee venue "just because individual employees were not identified." *In re Apple*, 2021 U.S. App. LEXIS 33788, at *8 (quoting *In re HP Inc.*, 826 F. App'x 899, 903 (Fed. Cir. 2020)).

GM argues that this factor favors transfer because compulsory process is available for more third parties in the EDMI than the WDTX. ECF No. 34 at 9. In its Motion, GM identifies 86 third parties who are potentially relevant to this case, including 27 inventors, 43 prior assignees of the Patents-in-suit, and 16 GM suppliers who provide all or portions of the accused technologies. *Id.* According to GM, ten of these third-party suppliers of relevant parts or functionalities of the accused technology are within the compulsory process of the Eastern District of Michigan. *Id.* at 10. By contrast, GM argues that "[o]nly one of the nonparty witnesses here, a named inventor of the '158 Patent, resides within the Western District of Texas's compulsory process." *Id.* at 9.

In response, IV contends that it has "identified at least the following 121 potential non-party witnesses, which are located in or within 100 miles from the WDTX and have information and documents relevant to the issues of infringement and damages." ECF No. 43 at 17. Specifically, IV identifies the following non-party witnesses: (1) GM Financial Company, Inc., which has relevant financial information; (2) 7 GM-authorized dealers that sell vehicles and parts

with the infringing technologies; (3) 9 parts dealers that sell parts with the infringing technologies; (4) 103 GM suppliers; and (5) the inventor of the '158 Patent, Feng-Quin Sun. *Id.* IV argues that "[t]hese non-party witnesses are all subject to the compulsory process in the WDTX." *Id.* IV argues that in contrast, "GM identified only 10 non-party witnesses in the EDMI's subpoena power, including: (i) 10 suppliers and (ii) zero inventors." *Id.*

In reply, GM contends that it conducted an extensive investigation to identify third-party suppliers of the relevant technologies, and that it found that a majority of these suppliers—10 of 18—are in EDMI. ECF No. 45 at 5. According to GM, "[n]o GM supplier known to provide parts or functionalities related to the accused technology is in WDTX." *Id.* at 6. It contends that none of its Texas-based suppliers provide the relevant technologies, and that the length of GM's list of Texas-based suppliers is irrelevant. *Id.* GM also replies that the nine Texas parts dealers IV identified similarly get no weight in the convenience analysis because there is no evidence these dealers supply any parts relevant to this case. *Id.*

GM then goes into more detail on why the 103 GM suppliers within the Court's subpoena power have nothing to do with this matter. *Id.* at 9. According to GM, IV has only identified four of these suppliers as potentially relevant. *Id.* GM contends that each of these do not weigh in favor keeping this case in Texas. *Id.* For ████, GM contends that the relevant witnesses are in witnesses are in Michigan or Atlanta. *Id.* For ████ GM contends that ████ Austin location is not listed as a GM supplier and that it instead GM deals with ████ in EDMI. *Id.* For ████ GM contends that there is no evidence that ████ ever supplied chips for any accused products. *Id.* For ████ GM argues that IV has set forth no evidence showing how ████ is relevant to this case. *Id.*

As for GM Financial, GM contends that GM Financial is a financial services company that provides auto loan financing through dealers across the U.S. and Canada, and that GM has "'very

little' interaction with GM Financial." *Id.* at 9 (quoting ECF No. 45-1 at 197:6–14; 199:11–200:4, 207:4–209:11). And in regard to the various Texas-based dealerships identified by GM, GM contends that "[d]ealerships have no role in the design, development, or implementation of the accused technologies," and that "Texas dealerships are not a source of relevant information, particularly where financial data is maintained by GM itself in Michigan." *Id.*

In its sur-reply, IV first rebuts GM's claims that the GM-authorized dealers have no role in the design and development of the accused technologies. ECF No. 48-1 at n.1. IV contends that "those dealers do have relevant financial information, and GM failed to show otherwise." *Id.* IV then rebuts GM's claim that "an overwhelming majority [of the 103 WDTX GM suppliers] have nothing to do with this matter." *Id.* at n.2. IV argues that "GM fails to state how many WDTX suppliers do have relevant information." *Id.* Similarly, IV then contends that "GM offers no evidence to rebut the fact that its Financial Headquarters in Fort Worth have relevant financial information." *Id.* at 5 n.3.

The Court finds that this factor weighs slightly against transfer. To begin, IV does not appear to dispute that GM has identified 10 suppliers in the EDMI that are relevant. *See* ECF No. 48-1 at 5. Accordingly, the Court is convinced that these 10 suppliers are relevant and material to this case, and the Court will weigh them in favor of transfer. GM does not identify any other relevant third parties in EDMI. Therefore, the Court must consider what is at the heart of this dispute over the compulsory process factor, the relevant third parties that this Court can compel.

The Court finds that IV has identified that a named inventor of one of the Asserted Patents is in the WDTX and that there are no named inventors in the EDMI. The Court accords this great weight because an inventor's testimony will likely be highly relevant and material at trial. This Court can compel this inventor to testify, while the EDMI cannot compel a single inventor. GM's

arguments against this Court according weight to the one named inventor being present in the WDTX and not the EDMI are unpersuasive. GM argues only that he is one of four inventors of the '158 Patent and the only one of 27 inventors of the asserted patents located in this District. But GM does not respond to the fact that it is only this inventor that either Court can compel to testify. Thus, this fact alone weighs strongly against transfer.

As to the Texas-based suppliers identified by IV, the Court is not convinced that IV has shown that all 103 suppliers within the subpoena power of this Court are relevant. But the Court is also not convinced that none of these suppliers are irrelevant. Particularly persuasive is IV's argument that GM merely argues "an overwhelming majority" of the 103 WDTX suppliers "have nothing to do with this matter." *See* ECF No. 45 at 9. Yet, as IV points out, GM fails to state how many of these WDTX suppliers do have relevant information. Accordingly, the Court will not dismiss the fact that there appears to be some unknown number of third-party suppliers in the WDTX that are relevant to this case. As to the suppliers in the WDTX that GM does address— ██████████████████████—IV fails to address any of these in its sur-reply. First, as to ██████, GM states that the relevant witnesses are in Michigan or Atlanta. *See* ECF No. 45 at 9 (citing ECF No. 43-5 at 19–20). But even a cursory review of that cited document reveals a ██████████ ████████████████████████████████ Dallas, Texas. ECF No. 43-5 at 19– 20. Thus, even by GM's own admission, there is a relevant ██████ witness within Texas and the subpoena power of this Court. Second, as to ██████ GM states that its Austin location is not listed as a GM supplier. ECF No. 45 at 9 (citing ECF No. 43-5 at 21–26). The Court agrees that ██████ Austin location is not listed as a GM supplier and IV fails to rebut this. Accordingly, the Court finds that ██████ is likely not a relevant third-party that this Court can compel. Third, as to ██████, GM contends that "[t]here is no evidence ██████ ever supplied ██████ for any accused product." ECF

No. 45 at 9 (citing ECF No. 45-2 85:14–89:23). Yet nowhere does GM deny that it used ████ ████ for the accused products. The Court thus finds that ████ is a potential relevant third-party that this Court can subpoena. Fourth, GM argues that "IV set forth no evidence showing how ████ ████████████████████████████, is relevant to this case. *Id.* at 9. But just as it did with ████ GM does not deny that ████ could potentially be relevant to this case. *See id.* Thus, the Court is not convinced that GM has shown how ████ would not be a potentially relevant third-party witness in this case. Thus, IV has shown that at least three relevant third-party suppliers can be compelled by this Court. IV has also shown that at least some of GM's 103 suppliers in Texas are relevant and can be compelled. This weighs against transfer.

The Court next considers that GM Financial that is within the subpoena power of this Court. The Court finds that GM's arguments that it must discount the weight given to this third party are unpersuasive. The Court is convinced that GM Financial is a relevant third-party that contains material information on damages and is within the subpoena power of this Court. Thus, this also weighs against transfer

The Court finally considers GM's Texas-based authorized-dealers and parts-dealers. While the Court agrees in-part with IV that GM has not sufficiently shown that these dealers and parts-dealers do not have relevant information on the damages in this case, the Court finds that these third-parties will be given minimal weight given the above witnesses in the WDTX and the EDMI.

In sum, the Court finds that both the EDMI and the WDTX have relevant third parties. On balance, however, IV has identified more relevant third-party witnesses in the WDTX than GM has identified in the EDMI. Accordingly, this factor weighs slightly against transfer.

3.    <u>Relative Ease of Access to Source of Proof</u>

"In considering the relative ease of access to proof, a court looks to where documentary evidence, such as documents and physical evidence, is stored." *Fintiv, Inc. v. Apple Inc.*, No. 6:18-cv-00372-ADA, 2019 U.S. Dist. LEXIS 171102, at *5 (W.D. Tex. Sept. 10, 2019). This factor relates to the relative—not absolute—ease of access to non-witness evidence. *See In re Radmax*, 720 F.3d at 288; *In re Apple*, 979 F.3d at 1339. And "the movant need not show that all relevant documents are located in the transferee venue to support a conclusion that the location of relevant documents favors transfer." *In re Apple*, 979 F.3d at 1340. In *Radmax*, the Fifth Circuit held that, though the distance between two divisions was slight, because all the documents and physical evidence were in the transferor division, this factor favored transfer. 720 F.3d at 288.

The Fifth Circuit has held that, even in the context of electronic documents that can be accessed anywhere on earth, this factor is not superfluous. *See Volkswagen II*, 545 F.3d at 316; *In re Dish Network L.L.C.*, No. 2021-182, 2021 U.S. App. LEXIS 31759, at *6 (Fed. Cir. Oct. 21, 2021). Though having consistently characterized that holding as antiquated in the setting of a modern patent dispute, this Court will continue to analyze this factor with a focus on the location of: physical documents and other evidence; and the hardware storing the relevant electronic evidence. *See Def. Distributed v. Bruck*, 30 F.4th 414, 434 & n.25 (5th Cir. 2022) (giving weight to the location of servers hosting the electronic documents in dispute); *Bluebonnet Internet Media Servs., LLC v. Pandora Media, LLC*, No. 6-20-CV-00731-ADA, 2021 U.S. Dist. LEXIS 137400, at *7 & n.1 (W.D. Tex. July 22, 2021). However, the Fifth Circuit finds that "the location of evidence bears much more strongly on the transfer analysis when, as in *Volkswagen*, the evidence is physical in nature." *In re Planned Parenthood Fed'n of Am., Inc.*, No. 22-11009, 2022 WL 16549164, at *3 (5th Cir. Oct. 31, 2022).

The Federal Circuit has held that it is error not to also consider: "the location of document custodians and location where documents are created and maintained, which may bear on the ease of retrieval." *In re Google*, 2021 U.S. App. LEXIS 33789, at *7; *see also Def. Distributed*, 30 F.4th at 434 & n.25 (considering, under this factor, where the "research, design, development, manufacturing, and publishing" of the allegedly offending files occurred). Finally, evidence located at a party's office that is not a "place of regular business" may be discounted. *See In re Google*, 2022 WL 1613192, at *4.

The Court finds that this factor slightly favors transfer. GM represents that its documentary evidence relevant to the accused technology is found in the EDMI. ECF No. 34 at 7–8. GM contends that its "technical information and documents, including design specifications and source code, are used and maintained by the GM's Product Development Team, located in Detroit." *Id.* at 8 (citing Declaration of Jeffrey Liedel ("Liedel Decl."), ECF No. 34-5). According to GM, this information is stored electronically at GM's data centers located in Milford or Warren, Michigan. *Id.* GM's explains that its financial information, including accounting and purchase information for the accused technologies, is maintained by GM's Accounting Department, located at GM headquarters in Detroit, but is stored electronically at the same Michigan data centers. *Id.* (citing Liedel Decl. ¶ 5). GM further explains that any licensing information is stored at the same Michigan data centers. *Id.*

GM then explains that the "GM Texas locations identified in IV's Complain [sic] neither create nor maintain documents or data relevant to this suit." *Id.* GM further asserts that "[t]o the extent there is any documentation on the accused technologies maintained at the Austin IT Center, that information would relate to data analysis from, or customer-facing applications of, the technology." *Id.* GM finally contends that for its remaining facilities in Texas, "even if any of these

facilities has any documents or data relevant to this matter, such information is stored at the GM data centers in Michigan." *Id.*

In response, IV argues that factor weighs against transfer because hundreds of GM software developers, engineers, and other employees continuously generate and work on documents at the Austin IT Innovation Center and the Austin Customer Engagement Center. ECF No. 43 at 15–16 (citing Liedel Decl., ¶ 6 (data is created by Austin employees); Jacobson Decl., ¶ 14 (Austin employees collect/analyze data and work on ███████████████████████████████), *id.* ¶ 15 (Austin employees collect/analyze software and hardware data)). IV further contends that GM has admitted "that GM's Austin employees have access to all relevant data, including the electronically stored data in the EDMI." *Id.* at 16 (citing Jacobson Tr. at 226:21–24 (the GM data is accessible by the GM employees in Austin or wherever they are)).

Then IV responds that GM has failed to show that it has designed or developed any of the infringing technologies in the EDMI. *Id.* IV argues that "none of GM's three declarations submitted in support of the Motion states that GM designed or developed the infringing technologies in the EDMI or elsewhere." *Id.* Importantly, IV asserts that GM admitted in its Motion that "[m]any of the accused hardware and software components are designed and developed by third parties." *Id.* (citing Motion at 4).

In reply, GM first attempts to rebut IV's contention that the accused technologies were even developed in the EDMI. ECF No. 45 at 4. First, GM cites the declaration of Mr. Przybylski, which explained that "GM's development, design and implementation of these technologies largely, if not exclusively, are handled by GM's [GPD] organization, which is based in Michigan." *Id.* Second, GM cites Mr. Jacobson's deposition, which explained the following: ████████████ ███████████████████████████████ was developed in Michigan; (2) team responsible for

███████████████████████████████████████████ is located in Michigan; and (3) Validation testing of the GM vehicles, including, for example, validation testing of the accused infotainment systems, is done in Michigan. *Id.*

GM then replies that its corporate information is stored electronically on servers in Michigan. *Id.* at 5. It argues that this weighs in favor of transfer because it contends that Fifth Circuit law focuses on the location of servers. *Id.* It further argues that IV does nothing to rebut this. *Id.* According to GM, IV "argues that GM employees in Texas can (i) generate documents, and (ii) in theory, access GM's electronically stored information stored in Michigan." *Id.* GM contends that this does not weigh against transfer. *See id.*

In its sur-reply, IV reiterates its argument that "GM has failed to explain which accused technologies were developed by GM in the EDMI and to identify any source code or development documents there." ECF No. 48-1 at 1. IV first alleges that GM's reply contradicts its venue declarant's, Mr. Jacobson, testimony that he did not know whether GM designed any of the hardware or software on the telematics units. *Id.* Then GM cites the testimony of Mr. Jacobson that it was "possible" that the numerous Austin engineers that IV identified had access to source code that relates to the accused technologies. *Id.* IV therefore contends that GM has not met its burden to show that GM's engineers in Austin do not work on this design. *Id.*

In sum, the Court finds that this factor slightly favors transfer. The Court is convinced that GM has shown that its relevant documents are stored electronically on data centers in the EDMI. Accordingly, this fact alone weighs in favor of transfer. *See Def. Distributed v. Bruck*, 30 F.4th 414, 434 & n.25 (5th Cir. 2022). However, the Federal Circuit has held that it is error not to also consider: "the location of document custodians and location where documents are created and maintained, which may bear on the ease of retrieval." *In re Google*, 2021 U.S. App. LEXIS 33789,

at *7. The Court is not convinced that GM has shown that there are no relevant document custodians in or near the WDTX. As the Court explained above for the willing witness factor, the Court found significant the significant presence of relevant witnesses working on at least some of the Accused technologies in the WDTX. It is likely that these engineers in the WDTX are creating and maintaining relevant documents even if they are stored on servers in the EDMI. Thus, this weighs against transfer. The Court also finds that the headquarters of GM Financial, which is likely to have relevant documents in regard to damages in this case, weighs against transfer. It is unclear whether these documents are also stored on servers in Michigan or not. Ultimately, a most of the relevant documents that are identified by the parties appear to be electronic. Thus, under *In re Planned Parenthood*, this factor does not have as much bearing on whether this Court transfers this case as the above factors do. *See* 2022 WL 16549164, at *3. In conclusion, the Court finds that this factor slightly favors transfer to the EDMI.

### 4. Practical Problems

When considering the private interest factors, courts must consider "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Volkswagen II*, 545 F.3d at 314. "[G]arden-variety delay associated with transfer is not to be taken into consideration when ruling on a § 1404(a) motion to transfer" but delay in already protracted litigation may account for some weight. *In re Radmax*, 720 F.3d at 289.

"Particularly, the existence of duplicative suits involving the same or similar issues may create practical difficulties that will weigh heavily in favor or against transfer." *PersonalWeb Techs, LLC v. NEC Corp. of Am., Inc.*, No. 6:11-CV-655, 2013 WL 9600333, at *5 (E.D. Tex. Mar. 21, 2013). "The interests of justice may be best served by transferring ancillary matters pending in other forums to the forum of the main action, particularly if the main action is complex."

*Bank of Texas v. Computer Stat., Inc.*, 60 F.R.D. 43, 45 (S.D. Tex. 1973). "[T]he ability to transfer a case to a district with numerous cases involving some overlapping issues weighs at least slightly in favor of such a transfer." *In re Apple Inc.*, 979 F.3d at 1344. But district courts should not rely "on considerations of judicial economy arising after the filing of the lawsuit or the transfer motion," such as, for example, suits filed in the transferor district after a request to transfer. *In re Netscout Sys.*, No. 2021-173, 2021 U.S. App. LEXIS 30500, at *12 (Fed. Cir. Oct. 13, 2021). Further, "the mere co-pendency of infringement suits in a particular district" does not automatically tip transfer in one direction or the other. *Id.* at *13. In weighing this factor, this Court must "consider the presence of co-pending motions to transfer." *Parus Holdings Inc. v. LG Elecs. Inc.*, No. 6:19-CV-00432-ADA, 2020 WL 4905809, at *7 (W.D. Tex. Aug. 20, 2020); *see also In re Google Inc.*, No. 2017-107, 2017 WL 977038, at *2 (Fed. Cir. Feb. 23, 2017).

This factor is neutral. GM contends that because this case is in its infancy and that there are no overlapping suits in either district, this factor is neutral. IV responds that "[b]ecause the Court is already familiar with this matter and transferring the case to a completely new court will take time and require more resources, judicial economy disfavors transfer." The Court disagrees. This case has not yet proceeded to a *Markman* hearing and so has not yet matured to a stage where this factor would counsel against transfer. With no other practical problems before it, this Court concludes that this factor is neutral.

### B. Public Interest Factors

#### 1. Court Congestion

The relevant inquiry under this factor is "[t]he speed with which a case can come to trial and be resolved." *Genentech*, 566 F.3d at 1347; *In re Apple*, 979 F.3d at 1343. A faster average time to trial means more efficient and economical resolutions of the claims at issue. That said, "[a] court's general ability to set a fast-paced schedule is not particularly relevant to this factor." *In re*

*Apple*, 979 F.3d at 1344. Moreover, when other relevant factors weigh in favor of transfer or are neutral, "then the speed of the transferee district court should not alone outweigh all of those other factors." *In re Genentech*, 566 F.3d at 1347.

The Federal Circuit has held that a difference in the number of pending cases between the transferor and transferee forums is "too tenuously related to any differences in speed by which these districts can bring cases to trial." *Id*. In another case, it has opined that a "proper" analysis "looks to the number of cases per judgeship and the actual average time to trial." *In re Juniper Networks, Inc.*, No. 2021-156, 2021 U.S. App. LEXIS 29812, at *8 (Fed. Cir. Oct. 4, 2021).

The Federal Circuit has also held that, in the event time-to-trial statistics favor one district over another, the court must "point to any reason that a more rapid disposition of the case that might be available in Texas is worthy of important weight." *In re Juniper Networks*, 14 F.4th at 1322; *In re Samsung Elecs. Co.*, 2 F.4th 1371, 1380–81 (Fed. Cir. 2021).

GM concedes that EDMI's median time-to-trial being longer than this District's by more than two months. ECF No. 34 at 14. That this is the most speculative factor does not *per se* render this factor neutral, as GM would suggest. *See id.* Were that true, why wouldn't the Fifth Circuit have omitted it from the § 1404(a) analysis altogether? Given GM's concession as to time-to-trial statistics, this factor weighs slightly against transfer.

### 2. Local Interests

Under this factor, the Court must evaluate whether there is a local interest in deciding local issues at home. *Volkswagen II*, 545 F.3d at 317. Local interests in patent case "are not a fiction." *In re Samsung*, 2 F.4th 1380. "A local interest is demonstrated by a relevant factual connection between the events and the venue." *Word to Info, Inc. v. Facebook, Inc.*, No. 3:14-cv-04387-K, 2015 WL 13870507, at *4 (N.D. Tex. Jul. 23, 2015). "[T]he sale of an accused product offered

nationwide does not give rise to a substantial interest in any single venue." *In re Hoffmann-La Roche Inc.*, 587 F.3d 1333, 1338 (Fed. Cir. 2009). "This factor most notably regards not merely the parties' significant connections to each forum writ large, but rather the 'significant connections between a particular venue and *the events that gave rise to a suit*.'" *In re Apple*, 979 F.3d at 1344 (quoting *In re Acer Am. Corp.*, 626 F.3d 1252, 1256 (Fed. Cir. 2010)) (emphasis in original). But courts should not heavily weigh a party's general contacts with a forum that are untethered from the lawsuit, such as a general presence. *Id.* Where the movant has a "significant presence" in the transferor forum, this factor "heavily" favors transfer where the transferee forum has a "significant connection to the event that gave rise to [the] suit." *In re Apple*, 2021 U.S. App. LEXIS 33788, at *14–15. Moreover, "little or no weight should be accorded to a party's 'recent and ephemeral' presence in the transferor forum, such as by establishing an office in order to claim a presence in the district for purposes of litigation." *In re Juniper Networks*, 14 F.4th at 1320 (quoting *In re Microsoft Corp.*, 630 F.3d 1361, 1365 (Fed. Cir. 2011)).

The Court finds that this factor slightly favors transfer. GM argues that the EDMI is "the center of the design, development, and know-how of the operation and implementation of the accused technology." ECF No. 34 at 15. GM argues that the "Eastern District of Michigan is therefore the center of gravity for this action and has a local interest in deciding these issues." *Id.* GM further contends that the WDTX has "few connections to the case, and those connections are tenuous." *Id.*

In response, IV argues that this factor is neutral. ECF No. 43 at 20. IV explains that GM has "thousands of employees (including the critical employees in Austin) who develop, manufacture and sell the infringing products in the WDTX through multiple authorized dealers and distributors." *Id.* IV asserts that "GM's significant local presence and activities in the WDTX,

balanced against GM's limited number of witnesses in the EDMI and the fact GM does not design or develop many of the accused products in the EDMI, renders this factor neutral." *Id.*

In reply, GM argues that "[n]either nationwide sales of vehicles containing the accused technology nor GM's general presence in WDTX outweighs EDMI's local interests." ECF No. 45 at 10. And in sur-reply, IV reiterates that this factor is neutral because "WDTX has a localized interest because GM has thousands of employees and sells its infringing products in this district." *Id.*

The Court finds that both the EDMI and the WDTX have significant localized interests in this Action. As it did with the sources of proof factor, the Court finds significant that many of the actions that gave rise to this suit are in the EDMI. However, the Court cannot discount the significant presence that GM has in this district and that IV has identified employees in the WDTX that work on the accused technologies on in this case. GM employs thousands of employees in this district. GM does not have just a "general presence" in this district as it would want this Court to find. Because GM has a significant presence in this District and has a presence that gave rise to some issues in dispute, the localized interest in this Action only slightly favors transfer to the EDMI.

### 3. Familiarity of the Forum with Law-At-Issue

The parties do not dispute that this factor is neutral, and the Court agrees.

### 4. Conflict of Laws

The parties do not dispute that this factor is neutral, and the Court agrees.

## IV. DISCUSSION

Having considered the private and public interest factors, Court's conclusions for each factor is summarized in the following table:

| Factor | The Court's Finding |
|---|---|
| Relative ease of access to sources of proof | Weighs slightly in favor of transfer |
| Availability of compulsory process to secure the attendance of witnesses | Weighs slightly against transfer |
| Cost of attendance for willing witnesses | Neutral |
| All other practical problems that make trial of a case easy, expeditious and inexpensive | Neutral |
| Administrative difficulties flowing from court congestion | Weighs slightly against transfer |
| Local interest | Weighs slightly in favor of transfer |
| Familiarity of the forum with law that will govern case | Neutral |
| Problems associated with conflict of law | Neutral |

Four factors are neutral, local interest slightly favors transfer, access to sources of proof slightly favors transfer, availability of compulsory process weighs slightly against transfer, and the court-congestion factor weighs slightly against transfer. Given the foregoing, the Court finds that GM has not shown that the EDMI is *clearly* more convenient than this District. GM's Motion is therefore **DENIED**.

SIGNED this 3rd day of November, 2022.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE